Lydia CRUZ, Plaintiff,

v.

Margaret HECKLER, Secretary of Health and Human Services, Defendant.

No. 83 Civ. 184 (WCC).

United States District Court, S.D. New York.

March 27, 1984.

46

MFY Legal Services, Inc., New York City, for plaintiff; Carolyn A. Kubitschek, Gary S. Stone, Charles Whiddington, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Mary Anne Wirth, Asst. U.S. Atty., Annette H. Blum, Regional Atty., Region II, Barbara Spivak, Asst. Regional Atty., Dept. of Health and Human Services, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Plaintiff Lydia Cruz ("Cruz" or "the claimant") brought this action under sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended 42 U.S.C. 405(g) and 1383(c)(3), seeking review of a final determination by the Secretary of Health and Human Services (the "Secretary") that her period of disability had ended and she was no longer entitled to receive disability benefits or Supplemental Security Income ("SSI"). The Secretary has moved for judgment on the pleadings pursuant to F.R.Civ.P. 12(c), and Cruz has cross-moved for summary judgment pursuant to F.R. Civ.P. 56. Because the Secretary failed to develop and consider evidence critical to a just determination of the claimant's application, and because the lack of crucial information makes it impossible to discern whether the Secretary's determination is supported by substantial evidence, this matter will be remanded for further proceedings in accordance with the discussion below.

*Background*

Cruz is a 59-year-old woman who speaks only Spanish and whose education ended with the first grade. *See* tr. at 27–28.[1] She filed an application for disability benefits and SSI benefits in May 1978, alleging a disability as the result of bronchial asthma and gall bladder surgery. She was awarded a period of disability, retroactive to April 30, 1978, based upon her asthma condition. *See* tr. at 47. The Social Security Administration ("SSA") subsequently conducted a continuing disability investigation, and determined that as of October 1981, plaintiff's impairment was no longer sufficiently severe to prevent her from engaging in substantial gainful activity. *See* tr. at 45. Cruz was notified in December 1981 that she was no longer deemed disabled, and that her payments would cease immediately. See tr. at 46–47. She was told that a physician had reviewed her case and that according to the available medical evidence, her asthma condition had stabilized following treatment. It was the SSA's view that she was able to perform light work. *See* tr. at 53.

Cruz immediately requested a hearing in order to have this determination reviewed *de novo;* the hearing was held before Administrative Law Judge Robert J. Gallagher (the "ALJ") on May 7, 1982. A Spanish interpreter was provided to assist plaintiff, but she appeared without witnesses and without counsel. At the commencement of the hearing, the ALJ indicated to Cruz, through the interpreter, that since she had received notice of her right to counsel and had appeared without counsel, he assumed she wished to proceed without counsel. He asked whether that was correct, and Cruz responded "Yes." *See* tr. at 25–26. He then proceeded to question her about her medical condition.

During the hearing, which lasted approximately one-half hour and produced only sixteen pages of transcript, *see* tr. at 19, 38, plaintiff explained that before she stopped working in 1978, she had been employed by a bookbinder, and that her job primarily entailed carrying boxes filled with small pieces of cardboard and putting paper into a machine. *See* tr. at 29. She stated that her job required her to stand almost all the time. *See* tr. at 30.

The ALJ inquired of Cruz when she had last experienced an asthma attack, and she replied that the previous December she had suffered "quite a strong one." *See* tr. at 30. She then testified that she went to the emergency room at Bellevue Hospital three times during December. *See* tr. at 30, 32. Plaintiff stated that she made trips to the emergency room at Gouverneur Hospital

---

1. All citations refer to the pages as numbered for the complete record on appeal.

prior to December, *see* tr. at 32, and that when she could not get to an emergency room quickly, she would go somewhere closer. *See* tr. at 33.

Cruz testified that she lives alone, cleans house, and cooks for herself. *See* tr. at 34. She said, however, that she gets asthma attacks when she exerts herself, such as when she bends to lift things or to clean. *See* tr. at 37. In describing these asthma attacks, she stated that she experiences a shortness of breath and gets very nervous; she must open a window and sit down in bed in order to get air. *See* tr. at 36. Cruz testified that she goes to bed at about 10:00 in the evening and gets up at about 9:00 in the morning, but that she does not sleep well because she is nervous. *See* tr. at 34. She said that if she walks three blocks she becomes tired and must lie down, *see* tr. at 33, and that when she goes to the grocery store, which is four blocks from her home, she must go "little by little." *See* tr. at 35. She is able to ride buses and subways, but testified that when she goes to the emergency room, she takes a taxi. *See* tr. at 35.

Cruz described other ailments in addition to her asthma. She mentioned a broken wrist sustained in a fall following a dizzy spell, *see* tr. at 33, and a resulting tendon problem that causes her great pain and renders her unable to use that hand. *See* tr. at 35. She explained that her doctors had wanted to operate on her hand, but that she refused because she felt very sick. *See* tr. at 38. Cruz also complained of a swelling on the left side of her face, which might require surgery. *See* tr. at 37. She indicated that she had consulted a doctor about this condition, and although the ALJ expressed initial interest in ascertaining the doctor's name, he subsequently indicated that the information was unnecessary. *See* tr. at 38. The hearing then concluded.

A substantial accumulation of medical data was admitted into evidence at the time of the hearing, and the record was reopened on two subsequent occasions in order for the ALJ to receive additional relevant materials. Included among the records are outpatient treatment records from Gouverneur Hospital for the period 1962 to 1982; inpatient and outpatient records from Mt. Sinai Hospital for the period 1958 to 1982; the results of two consultative examinations, one performed in 1978 and the other in 1981; a 1981 evaluation of residual functional capacity; and letters from five doctors who had treated Cruz for asthma and other maladies in recent years. These records make it apparent that over the past several years, plaintiff has spent a considerable amount of time visiting doctors and hospitals, and she has suffered from a vast array of problems, including severe allergies, chronic rhinitis, arthritis, lower back pain, neck pain, an injured thumb, tendonitis, a fractured wrist, and "pains all over her body."

On the basis of these documents and the testimony given by Cruz at the hearing, the ALJ delivered a written decision on June 9, 1982. He found that the medical evidence did not substantiate plaintiff's allegation that her asthma was severe, or that she was precluded from performing substantial gainful activity. *See* tr. at 15. The ALJ declined to credit her testimony of discomfort and severe difficulty in breathing, and he concluded that after October 1981 she was not under a disability within the meaning of the Act. *Id.*

The ALJ was particularly impressed by the report of a consultative examination performed by Dr. Quereshy, and by the findings of a Dr. DeGuzman. *See* tr. at 14. Dr. Quereshy examined plaintiff on October 20, 1981, and found that her lungs sounded clear to percussion and auscultation, that a forced expiration revealed a few sibilant rhonchi, and that pulmonary tests revealed "a moderate degree of chronic obstructive lung disease." *See* tr. at 113, 124. Dr. Quereshy noted that Cruz did not exhibit respiratory distress while completing the pulmonary tests, but that she was very nervous and upset, and exhibited an inability to follow directions or perform properly. *See* tr. at 124. He concluded that plaintiff's condition did not appear

to be severe, as she was taking very little medication, and that she was fit for light or sedentary work. *See* tr. at 113.

Dr. DeGuzman saw Cruz for bronchial asthma twice in March of 1981. He did not find her to be in acute respiratory distress during her visits, and his examinations revealed no wheezing and no rales, symptoms which the ALJ felt would indicate a severe asthmatic condition. *See* tr. at 13–14.

The ALJ discredited the letters and reports submitted by several of claimant's doctors because their diagnoses of her asthma were unsupported by objective medical findings, contained no express evaluations of the severity of plaintiff's condition, and failed to note the treatment rendered. *See* tr. at 12–13. He went on to state that although Cruz testified at the hearing that she had had "several episodes of asthma attacks," she was unable to indicate the frequency of these attacks or the number of times she had sought hospital treatment. He summarized her testimony in this regard:

> She indicated her last attack was in December 1981, but she did not indicate that this required any hospital treatment. Claimant did not indicate that she has seen any doctors in connection with her asthmatic condition since on or about November 12, 1981, when she stated she had to go to Bellevue Hospital .... Medical records from Mt. Sinai Hospital ... reveal that claimant was followed in the out-patient clinic in 1981 .... She was not treated for any asthma attacks.

Tr. at 14. The ALJ then referred, somewhat inexplicably, to Cruz's testimony that she "went to the hospital several times in December for asthma." He discounted that testimony because he found "no evidence of record whatsoever that would indicate that she visited any hospital because of an acute asthmatic distress." *See* tr. at 14; *see also* tr. at 14, ¶ 3. ("Nor has the claimant provided any hospital emergency room records indicating the dates she was treated, clinical findings, and the treatment given in connection with her alleged asthmatic attacks."). Having thus reviewed

the evidence of Cruz's asthma condition, the ALJ determined that she had failed to meet her burden of submitting evidence to support her claim. *Id.*

Finally, the ALJ considered Cruz's complaints of tendonitis. He stated that although her hand was wrapped in an ace bandage at the time of the hearing, she could move her fingers without difficulty, and there was no evidence that the condition was severe or long-lasting. *See* tr. at 15. He therefore concluded that the claimant was not suffering from any severe physical impairment that would significantly limit her ability to perform basic work activities, and he declared that she was no longer entitled to disability benefits.

Cruz timely requested a review of the ALJ's decision. She submitted additional exhibits in support of her appeal, including a letter dated January 6, 1982 from a Dr. Goldman, associated with Bellevue Hospital, who stated that the claimant could not work because of her "frequent attacks of bronchial asthma," allergic rhinitis, and "mixed psychoneurosis." *See* tr. at 258. A Dr. Ramirez indicated in a June 7, 1982 letter that Cruz had been hospitalized at Bellevue Hospital for asthmatic attacks. *See* tr. at 259. In a June 9, 1982 letter written on Bellevue stationery, an employee named Mrs. Reid wrote that Cruz had been "admitted many times to this hospital for acute asthma." *See* tr. at 261. Reid asked that the SSA contact her if it needed any additional information. A "Statement of Treatment" from Bellevue Hospital indicated that Cruz was given emergency treatment for an asthma attack on December 24, 1981. *See* tr. at 260. Other new evidence documented that plaintiff had been under continuing treatment for asthma, arthritis, allergies and tendonitis. *See* tr. at 256–265.

The Appeals Council issued its determination on September 21, 1982. It stated that while the newly submitted reports revealed a new diagnosis of mixed psychoneurosis and continued treatment for plaintiff's other maladies, they failed to establish a degree of severity that would pre-

clude her from performing basic work activities. The Appeals Council also found that the new evidence was essentially the same as that contained in earlier reports, and therefore provided no basis for a change in the ALJ's decision. The determination of the Secretary was thereby finalized, and from that decision the plaintiff appeals.

*Applicable Legal Standards*

■ A claimant is entitled to disability benefits under the Social Security program if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected ... to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1). Further, an individual shall be determined to be under a disability only if his impairments

> are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The claimant need not demonstrate that he is completely helpless or totally disabled in order to qualify for benefits. *Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 41 n. 6 (2d Cir.1972).

■ In *Berry v. Schweiker*, the Court of Appeals for the Second Circuit set forth a five-step sequence to be utilized by the SSA in making an initial evaluation of a disability benefit application. First, the trier of fact should consider the claimant's current work activity. If the claimant is currently engaged in substantial gainful activity, he will not be found to be disabled. Second, the trier of fact should determine whether the claimant has a "severe impairment" which significantly limits his capacity to perform basic work activities. Basic work activities are defined as including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling. Third, the trier of fact should decide whether the claimant has an impairment as described in Appendix I of the regulations; if the condition qualifies under these guidelines, the individual must be determined to be disabled without consideration of vocational factors. Fourth, the trier of fact should determine whether the claimant's impairments prevent him from performing his past work. Fifth, if the claimant cannot perform his past work, the trier of fact should consider whether the claimant's remaining physical and mental abilities are consistent with the demands of other jobs and whether he has the vocational capabilities to make the adjustment to such new type of employment. 20 C.F.R. § 404.1503; *see Berry v. Schweiker*, 675 F.2d 464 (2d Cir.1982).

■ Under *Berry*, the claimant must establish a *prima facie* case by showing that he has an impairment which prevents his return to his prior employment, and the Secretary must then show the existence of alternative substantial gainful work. In other words, the claimant bears the burden of proof on the first four steps in the sequence above, while the Secretary has the burden of proving the fifth step.

■ Once a claimant obtains benefits, those benefits last only as long as the disability continues. The appropriate distribution of burdens is not as clear in termination proceedings as it is in initial disability determinations, however. At least six circuits have now concluded that in a termination case, there is a burden upon the Secretary to produce some evidence that the recipient's medical condition has improved to the point where he can work. *See, e.g., Patti v. Schweiker*, 669 F.2d 582, 587 (9th Cir.1982); *Cassiday v. Schweiker*, 663 F.2d 745, 749 (7th Cir.1981); *Miranda v. Secretary of HEW*, 514 F.2d 996, 998 (1st Cir.1975); *Kuzmin v. Schweiker*, 714 F.2d 1233 (3d Cir.1983); *Simpson v. Schweiker*, 691 F.2d 966, 969 (11th Cir. 1982); *Hayes v. Secretary of HEW*, 656

F.2d 204, 206 (6th Cir.1981). The Second Circuit has declined to resolve the question, *see Wheeler v. Heckler,* 724 F.2d 262 at 263 (2d Cir.1983); nonetheless, the court has stated that it is "unaware of any case in which the Secretary's termination of benefits previously awarded has been upheld in the absence of substantial evidence that the recipient's disability had ended." *Schauer v. Schweiker,* 675 F.2d 55, 59 (2d Cir.1982).

■ Substantial evidence is more than a mere scintilla. It has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). If the Secretary's determination that Cruz is no longer disabled is supported by substantial evidence, that determination will be conclusive, even if the Court's independent analysis of the evidence differs from that of the Secretary. In short, the Court will not decide the case *de novo.*

■ The substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts. *Rodriguez v. Califano,* 431 F.Supp. 421, 423 (S.D.N.Y. 1977). It is the function of the Secretary, and not this Court, to pass upon the credibility of witnesses, and great deference is generally given the judgment of the ALJ, who heard the witnesses and observed their demeanor. Of course, the Court is not required to accept the Secretary's decision if the Secretary failed to apply proper legal principles or failed explicitly to consider evidence critical to a just determination of the claimant's application. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

■ Finally, this Court must be satisfied that the claimant has had a full and fair hearing. *Gold v. Secretary of HEW,* 463 F.2d 38, 43 (2d Cir.1972). Where a claimant "is handicapped by lack of counsel, ill health, and inability to speak English, the courts have a duty to make a 'searching investigation' of the record." *Gold,* 463 F.2d at 43, *quoting Miracle v. Celebrezze,* 351 F.2d 361, 382–83 (6th Cir. 1965). This investigation includes an examination of whether the ALJ fulfilled his heightened duty scrupulously and conscientiously "to probe into, inquire of, and explore for all the relevant facts." *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir. 1980). In some instances, it is appropriate and necessary for the ALJ to subpoena records and witnesses on the claimant's behalf. *Donato v. Secretary of HHS,* 721 F.2d 414, 419 (2d Cir.1983). This assures that the beneficent purposes of the Act are served, and that deserving applicants are included in rather than excluded from its coverage. *Marcus v. Califano,* 615 F.2d 23, 29 (2d Cir.1979).

*Discussion*

In light of the legal standards and principles set forth above, I conclude that many of the ALJ's factual findings are not supported by substantial evidence, and that the ALJ failed to elicit sufficient evidence to assure a just determination of Cruz's claims. In addition, I find that the Appeals Council failed properly to consider evidence presented for the first time during the reviewing process.

■ In making his determination that Cruz was no longer disabled within the meaning of the Act, the ALJ relied primarily on his perception that certain critical evidence was missing from the record. I find fault with this reasoning on two grounds. First, and most obvious, is the fact that in several instances the ALJ's characterization of the testimony and the documentary evidence is plainly and inexplicably wrong. For example, the ALJ stated in his decision that although Cruz testified her last asthma attack was in December 1981, she did not indicate that this attack required hospital treatment. In fact, plaintiff testified that she went to the emergency room for asthma attacks three times in December. *See* tr. at 30, 32. The ALJ's review of the record led him to the

conclusion that Cruz was never treated at Mt. Sinai Hospital for asthma attacks. In fact, the Mt. Sinai records indicate that on April 20, 1981, she was treated in the emergency room for an "acute asthma attack." *See* tr. at 198. Obviously, the observation that "there is no evidence whatsoever that would indicate that [Cruz] visited any hospital because of any acute asthmatic distress," tr. at 14, is also flatly contradicted by the record. The ALJ also characterized plaintiff's diagnosis as "mild pulmonary obstructive condition," whereas the consulting physician on whom he heavily relied characterized the pulmonary obstruction as "moderate." *See* tr. at 113, 124. The foregoing are merely a few examples of the ALJ's mischaracterization of the evidence in the record. I believe that a claimant seeking a full and fair hearing is entitled to expect that the ALJ will pay close attention to the type of details on which he plans to rely in making an ultimate determination.

■ Equally disturbing are the ALJ's failure to elicit crucial evidence from this *pro se* claimant and her treating physicians, and his subsequent reliance upon the dearth of objective data in the record. It is apparent from even the most cursory review of the hearing transcript that Cruz was ill-equipped to make a coherent and organized presentation in support of her claim. Moreover, I am not at all convinced, based upon the ALJ's perfunctory reference to Cruz's apparent desire to proceed without counsel, that her decision was an informed one. The ALJ did not suggest, when she appeared alone, that she obtain legal aid. *Gold v. Secretary of HEW,* 463

F.2d 38, 43 (2d Cir.1972); *see also Montgomery v. Schweiker,* 529 F.Supp. 124 (D.Md.1981). Nonetheless, my concerns would have been allayed had the ALJ fulfilled his obligation to probe into and explore for all relevant facts. This he did not do.

In his decision, the ALJ faulted plaintiff for failing to demonstrate the frequency of her asthma attacks or the number of times she required hospital treatment for these attacks. The 16-page transcript reveals, however, that during the very brief hearing, the ALJ never asked her either of these obviously crucial questions. The absence of testimony or documentary proof in this regard is particularly troublesome in light of regulations promulgated by the Secretary that indicate a claimant should be deemed disabled if he or she suffers severe asthma attacks at least once every two months or at least six times a year. 20 C.F.R. § 404, Appendix I.

The ALJ correctly characterized many of the doctors' findings as conclusory, and he did make some creditable efforts to obtain specific and detailed statements from Drs. DeGuzman and Kramer, and from doctors at Bellevue Hospital. Still, in failing to follow up on many of the vague letters submitted at plaintiff's behest[2] and the unsatisfactory statements submitted in response to his own inquiries,[3] the ALJ defaulted in his duty to insure that all relevant evidence would be considered. Cruz could not have been expected to appreciate the shortcomings of these submissions.

---

2. Cruz submitted a document signed by a Dr. Rodriguez indicating that she was seen by him on November 13, 1981, and that he had diagnosed bronchial asthma. The form included the doctor's telephone number, and an instruction to call if additional information was needed. *See* tr. at 94. Dr. Julia Fusco submitted a one-paragraph note certifying that Cruz was under treatment for asthma and had suffered attacks on October 16, 1981 and November 14, 1981. Apparently, this was not followed up. There is also nothing in the record to show that the ALJ communicated with Mrs. Reid at Bellevue, who verified that Cruz had been admitted many times for asthma attacks.

3. The ALJ sent a medical report form to Cruz's doctors at Bellevue, for example, asking that they provide "sufficient details of history, physical and diagnostic findings, clinical course, therapy and response to enable a reviewing physician to make an independent determination as to the severity and duration of the impairment." *See* tr. at 138. Dr. Goldman, who plaintiff identified as the doctor who treated her asthma at Bellevue Hospital, responded with six words, one of which is "asthma" and four of which are illegible. *See id.* There is no indication that the ALJ ever pursued the matter with Dr. Goldman.

The ALJ could have sent follow-up letters to these doctors, or he could have subpoenaed them to appear at the hearing and provide the information he required. *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir.1972). As treating physicians, their diagnoses and opinions would have been entitled to great weight. *Carroll v. Secretary of HHS*, 705 F.2d 638 (2d Cir.1983). The ALJ could also have subpoenaed plaintiff's Bellevue Hospital records. It is surprising that he failed to do this, in light of her testimony that she was treated there three times in December 1981, and in light of the letter from Mrs. Reid, verifying that Cruz had been "admitted many times to [Bellevue Hospital] for acute asthma." This is not to suggest, of course, that had such evidence been adduced, it would have proven Cruz disabled; it is only to say that such evidence would have formed the basis for a more informed appraisal of the severity of her medical condition.

These errors alone are sufficient to justify a remand for the taking of further testimony. There are several other significant weaknesses in the Secretary's reasoning, however, that deserve mention. Having reviewed the exhibits insofar as they relate to plaintiff's treatment history and medical condition as it existed when she was first declared disabled in 1978, I find only the scantiest support for the proposition that her condition has either stabilized or improved since that time. The only evidence that plaintiff suffered from severe asthma in 1978 is the result of a pulmonary function test performed by Dr. Yentel, a consultative physician. His report indicates that Cruz's pulmonary capacity was quite low and that she experienced moderate respiratory distress in performing the test. *See* tr. at 109. His physical examination of the plaintiff revealed no evidence of asthma, however. He found her lungs clear to percussion and auscultation, and he found no rales, wheezing or rhonchi present. *See* tr. at 99. To the extent that they are legible, the Mt. Sinai Hospital records indicate that Cruz was treated only once for asthma in 1978, *see* tr. at 162, and the Gouverneur Hospital records show no treatment for asthma at all that year.

In contrast, Cruz's 1981 medical records show frequent trips to various doctors, hospital emergency rooms and walk-in clinics for treatment of asthma. A 1981 consultative examination showed a few sibilant rhonchi. *See* tr. at 113. A pulmonary function test performed in 1981 did show a slightly higher lung capacity than that recorded in 1978, but the 1981 scores were not expressly relied upon by the ALJ, and were still only just above the scores which, according to Appendix I of 20 C.F.R. § 404, indicate such a degree of severity that the Secretary is to presume the claimant is unable to perform substantial gainful activity. In any event, failure to meet these "listing" levels is not conclusive evidence that a claimant is not disabled.

The Secretary's determination also fails adequately to account for the potential impact of Cruz's other medical conditions. The ALJ did mention her tendonitis in his decision, but he found "no evidence" suggesting the condition was severe or long-lasting. In light of documentation from Dr. Rodriguez that she had been referred for surgical evaluation of the condition, *see* tr. at 137, records from Gouverneur Hospital indicating that she had muscle wasting in her right hand and that "all the motions of wrist are restricted due to pain," *see* tr. at 236, and Cruz's own testimony that the condition was so painful it rendered her unable to use the hand, I can only conclude, once again, that the ALJ failed to review the record carefully.

Finally, I take issue with the Appeal Council's summary rejection of certain new evidence it received, particularly the diagnosis of "mixed psychoneurosis" by Dr. Goldman. The Appeals Council found that the information contained in these documents was essentially cumulative, and did not merit further review. In fact, there was no diagnosis of psychological impairment in any of the exhibits examined by the ALJ, and there was no indication in his decision that he considered the possible existence of such a condition. In upholding

the ALJ's conclusion that Cruz was not suffering from a disabling physical impairment the Appeals Council should at least have considered whether the existence of "mixed psychoneurosis" might explain her persistent desire to seek medical treatment. Of course, to the extent that the evidence presented for the first time to the Appeals Council does not tend to establish the existence of a psychological impairment during the relevant time period, it need not have been considered.

For all of the reasons set forth above, I conclude that a full and fair hearing of Cruz's claim requires a remand for consideration of all available evidence relevant to her ability to engage in substantial gainful employment. Pursuant to the provisions of 42 U.S.C. § 423(g), plaintiff may elect to have her payments continued for the remand period. If she so elects and the Secretary affirms the initial determination on remand; the payments received in the interim shall be considered overpayments. 42 U.S.C. § 423(g)(2)(A). This case is hereby dismissed subject to reopening if additional proceedings are necessary following the Secretary's decision on remand.

SO ORDERED.