**Anna J. CASSIDAY, Plaintiff-Appellant,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.**

**No. 81–1460.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1981.

Decided Nov. 5, 1981.

---

11.  See text accompanying note 6 *supra*.

Richard H. Finley, Kendallville, Ind., for plaintiff-appellant.

Steven J. Plotkin, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, FAIRCHILD, Senior Circuit Judge, and BROWN,* Senior District Judge.

CUMMINGS, Chief Judge.

In March of 1974 Anna J. Cassiday applied for disability benefits under the Social Security Act, 42 U.S.C. § 423 (1976). Her claim was based on a diagnosis of thoracic outlet syndrome and bilateral median and ulnar neuropathy. In laymen's terms, occlusion of the blood vessels leading from the chest to the arms and compression of major nerve roots were causing Mrs. Cassiday to experience pain in her chest and pain, numbness, tingling, and weakness in her arms and hands. Mrs. Cassiday's claim was denied on July 29, 1974. Subsequently it was reconsidered and approved, with benefits made retroactive to February 25, 1974.

At roughly annual intervals, Indiana Rehabilitation Services, acting under contract to the Social Security Administration, reviewed Mrs. Cassiday's case to see if her condition had improved. The first such review, in November of 1975, found that her disability was continuing. On November 15, 1976, however, Mrs. Cassiday was noti-

fied that her benefits would be terminated, because she could then engage in substantial gainful employment.[1] This time reconsideration was unavailing. An administrative law judge (ALJ) conducted a *de novo* hearing and denied benefits on June 29, 1979. The Appeals Council declined to review his decision. On September 28, 1979, Mrs. Cassiday sought reversal of the administrative decision in federal district court. On January 21, 1981, Judge Eschbach denied Mrs. Cassiday's motion for summary judgment and granted the motion for summary judgment of the Secretary of Health and Human Services. Mrs. Cassiday then appealed to this Court. For the reasons set out below, we reverse and remand to the Secretary for the allowance of disability benefits to Mrs. Cassiday.

I

On appeal Mrs. Cassiday makes two arguments. First, had the Secretary given the proper weight to the opinions of treating, examining, and reviewing physicians as required by our decisions in *Carver v. Harris*, 634 F.2d 363 (7th Cir. 1980), and *Allen v. Weinberger*, 552 F.2d 781 (7th Cir. 1977), there would have been insufficient evidence in the record to support a determination that she was no longer disabled. Second, had the Secretary followed established precedents and his own regulations, he could not alternatively have concluded that, though disabled, Mrs. Cassiday was barred from receiving benefits because she refused to undergo surgery to cure or ameliorate her condition.

In reviewing the decision to terminate Mrs. Cassiday's benefits, we find sound guidance in the analysis in *Miranda v. Secretary of Health, Education and Welfare*, 514 F.2d 996, 998 (1st Cir. 1975) (citations and footnote omitted), where Judge Levin Campbell stated:

The concept of "burden of proof" is in this context rather confusing. It is true that one claiming benefits is sometimes

---

* The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation.

1. Because of administrative delays, Mrs. Cassiday's official termination did not take effect until February 1977.

described as having the "burden of proof", meaning that he must furnish requisite medical and other evidence within his grasp, see 42 U.S.C. § 423(d)(5), and show reasonable diligence in maintaining his claim. * * * For his part, however, the Secretary must make an investigation that is not wholly inadequate under the circumstances. And once having found a disability, the Secretary may not terminate the benefits without substantial evidence to justify so doing. This will normally consist of current evidence showing that a claimant has improved to the point of being able to engage in substantial gainful activity; but it might also consist of evidence that claimant's condition is not as serious as was at first supposed. As for the claimant, he remains at all times under a duty to exercise reasonable diligence in furnishing the Secretary with evidence relevant to his claim.

### A

It is necessary to begin with a brief chronology of Mrs. Cassiday's various medical examinations. Dr. Carl Stallman, a general practitioner in Kendallville, Indiana, had been Mrs. Cassiday's family doctor since 1960. Early in 1974 he referred her to Dr. Roger Murray, a Kendallville family practitioner and general surgeon. Dr. Murray hospitalized her and made the first tentative diagnosis of her condition. Dr. Murray in turn referred Mrs. Cassiday to Dr. Louis Romain, a neurologist in Fort Wayne. Dr. Romain hospitalized her for extensive tests in April 1974, confirmed the diagnosis of moderate to severe bilateral thoracic outlet syndrome, and recommended surgical removal of four ribs, two on either side of Mrs. Cassiday's heart.[2] Four additional doctors examined but did not treat Mrs.

Cassiday. Each of them saw her only once. Dr. William LaSalle, an orthopedic surgeon in Fort Wayne, saw Mrs. Cassiday in August of 1974 and could find no explanation for her severe symptoms.[3] Dr. Antonio Donesa, a Fort Wayne neurosurgeon, saw her in November 1975. He concluded that she did have bilateral thoracic outlet syndrome and that her back and neck pain might be relieved by surgery. He pronounced her capable of doing "sedentary light work on a sustained basis." Dr. Fred Lamb, a neurologist in Fort Wayne, examined Mrs. Cassiday in September 1976; like Dr. Donesa, he assumed that Mrs. Cassiday's condition had been accurately diagnosed but believed that she could do light sedentary work. Dr. Lee Cattell, an orthopedic surgeon in Indianapolis, examined Mrs. Cassiday in December of 1976. He, too, concurred in the diagnosis. However, he thought that Mrs. Cassiday could engage in no continuous useful activity because of the loss of circulation in her hands. Finally, Mrs. Cassiday's history was reviewed by two more doctors, both staff members of Indiana Rehabilitation Services. In January 1977 Dr. William Franklin, an orthopedic surgeon, suggested that disability benefits be continued, based on documented nerve root compression.[4] A month later, Dr. A. H. Oleynick, a neurologist, recommended termination: Mrs. Cassiday could do any work that did not require her arms to be raised above shoulder level, and surgery might relieve all of her symptoms.

The Social Security Administration acknowledges that "[t]he weight to be given [a] physician's statement depends on the extent to which it is supported by specific and complete clinical findings and is consistent with other evidence as to the severity and probable duration of the individual's

---

2. It was apparently Dr. Romain's report, sent to the agency in September 1974, that led to a reconsideration of the initial denial of benefits. Tr. 197–200.

3. Dr. LaSalle noted, however, that Dr. Romain had evaluated Mrs. Cassiday's condition "quite extensively" and "would have a most complete report concerning this * * *." Tr. 195.

4. Dr. Franklin had earlier recommended termination, relying on the reports of Drs. LaSalle and Donesa. Tr. 215. The reports of Drs. Lamb and Cattell evidently caused him to change his mind. Tr. 221.

impairment or impairments." 20 C.F.R. § 404.1526 (1980).[5] Our decisions do no more than give practical application to this general principle. We summarized our position in *Carver v. Harris*, 634 F.2d 363, 364 (7th Cir. 1980) (*per curiam*):

> In *Allen v. Weinberger*, 552 F.2d 781 (7th Cir. 1977), * * * [w]e held first that the opinions of a treating physician are entitled to greater weight than those of a doctor who examined plaintiff only once. *Id.* at 786. We then considered the conclusions of the physicians who did not examine plaintiff but looked at his medical file:
>
>> Although their reports were not inadmissible as hearsay at the hearing before the ALJ, ... the weight to be attached to the reports must be considered in light of the fact that neither physician examined the plaintiff .... Their reports, "without personal examination of the claimant, deserve little weight in the overall evaluation of liability. The [medical] advisers' assessment of what other doctors find is hardly a basis for competent evaluation ...."
>
> *Id.* (quoting *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974)).

The Secretary argues that his decision comports with our guidelines. He notes that in *Allen* we reversed the agency's finding that there was no disability, basing our decision on the weight that should have been given to the treating physician's findings. He argues that in Mrs. Cassiday's case the treating physicians' opinions were adequately weighed in determining initially that the disability existed. However, the Secretary also notes that in *Allen* we upheld a decision that the disability had later improved, allowing the Secretary to resolve the conflict between the opinions of two examining physicians. He therefore maintains that he is equally free here to resolve conflicts, choosing to credit Dr. Lamb over the other examining physicians and Dr. Oleynick over his fellow reviewing physician (Tr. 17–18).

■ The difficulty with the Secretary's position is that it allows the agency to isolate parts of what is essentially a continuous medical record and then apply tiebreaker rules to each of the constituent elements. Taken separately, each application may accord with the letter of *Allen* and *Carver*; cumulatively they have an arbitrary quality that is far from the spirit of those decisions.

Thus, for example, the Secretary relegates the reports of Drs. Murray and Romain to the status of "examinations preceding the September, 1976 basis for cessation." The sole event that occurred in September 1976 was Dr. Lamb's examination of Mrs. Cassiday, and it only furnished a "basis for cessation" if it was entitled to be accorded decisive weight. The circularity of this reasoning is thus apparent.

Further, Dr. Cattell's December report directly contradicted Dr. Lamb's. The conflicting assessment, the Secretary argues, "is of no fatal concern," because the Secretary was entitled to "resolve [ ] this conflict by giving full credence to the report of Dr. Lamb at the time of his examination" (Tr. 17). The Secretary relies on language from *Allen*, 552 F.2d at 787, without appreciating the factual limitations in that case. In *Allen*, the Secretary was choosing between nearly contemporaneous opinions, and "[t]he record does not disclose any medical evidence subsequent to [the credited] report that is inconsistent with its conclusion." *Id.* *Allen* is not authority for the Secretary's license to choose one report and one narrow time-period and disregard all other evidence. The Secretary's argument is also undercut because his inquiry was not in fact focused on September 1976. The reviewing physicians submitted their reports on Mrs. Cassiday's condition in January and February of 1977, after Dr. Cattell's report had been sent to the agency.

There is incoherence, too, in the Secretary's preference for one reviewing physi-

---

5. The disability regulations have been substantially revised and simplified. The gist of the above-quoted language can now be found at 20 C.F.R. §§ 404.1526–.1528 (1981).

cian's report over the other's, on the basis that the preferred doctor was a neurologist and the disfavored doctor an orthopedic surgeon. Since neither doctor saw Mrs. Cassiday, and since both had specialties relevant to her condition, the reason for such a pronounced preference is not obvious. That it is not a preference but a rationalization is suggested by the agency's using Dr. Franklin, the orthopedic surgeon, to evaluate Mrs. Cassiday's claim on two separate occasions, and calling in Dr. Oleynick only after Dr. Franklin had recommended continuation of benefits.

■ Admittedly, Mrs. Cassiday's claim was difficult to evaluate. That she suffered from a serious neurological and circulatory disorder was universally conceded. It was on that basis that benefits were first granted from February of 1974. The agency found in 1975 that Mrs. Cassiday's condition continued to preclude substantial gainful employment. In 1976, however, it reversed its position. Given that the evidence continued to show the existence of the same condition, and given that there was no question of improvement but only disagreement about how totally disabling the condition had ever been, we think Mrs. Cassiday made out a *prima facie* case and the burden had shifted to the Secretary to justify the termination of benefits. See *Miranda v. Secretary, supra*. The highly selective approach the Secretary took to his raw materials did not transform them into substantial record evidence that Mrs. Cassiday could work. The most that could be said at the time the benefits stopped was *non liquet* (it is not clear). *Non liquet* here means that the Secretary, as the burdened party, did not make his proof by even the modest standard to which he is held.

**B**

■ The Secretary urges an alternate ground for terminating Mrs. Cassiday's benefits: assuming *arguendo* that she was disabled, she was required to undergo surgical removal of her ribs to improve her condition. The Secretary points to the following

6. Cf. 20 C.F.R. § 404.1530 (1981) (new version).

agency regulation (20 C.F.R. § 404.1518 (1980)): [6]

> An individual with a disabling impairment which is amenable to treatment to restore his ability to work shall be deemed to be under a disability if he is undergoing therapy prescribed by his treatment sources but his impairment has nevertheless continued to be disabling or can be expected to be disabling for at least 12 months. However, an individual who willfully refuses to follow such prescribed treatment cannot by virtue of such failure be found to be under a disability. Willful failure does not exist if there is justifiable cause for failure to follow such treatment.

To find that Mrs. Cassiday was precluded from receiving benefits under this regulation, several elements have to be established. First, the impairment must be "amenable to treatment to restore [the patient's] ability to work." It must be shown not only that some palliative treatment is available, but also that the rejected treatment "could be expected to restore [the] ability to work." *Schena v. Secretary of Health and Human Services*, 635 F.2d 15, 19 (1st Cir. 1980). Nothing in the record ties the surgery specifically to a restoration of Mrs. Cassiday's ability to work.

Second, the treatment must be "prescribed." Recommendations, suggestions, and abstract opinions are not enough. 635 F.2d at 19. The record here does not warrant finding prescription. Dr. Romain's discharge report (Tr. 184) says only, "[Mrs. Cassiday] does not choose to have surgery at this time." His later report to the agency (Tr. 197) elaborates:

> Following the neurological workup, surgery was recommended but the patient was reticent to have this performed. At the time of this letter [Sept. 9, 1974], she continues to be symptomatic as outlined above and has not yet decided to have surgery, despite the fact that it has been recommended. * * * Her prognosis without surgery would be extremely

guarded but with surgery it would appear that the problem can be greatly if not completely alleviated.

Dr. Murray, in a telephone report in October 1974 (Tr. 216), was more guarded: he told Mrs. Cassiday "that in most cases results are good, but he could not promise that hers would be." Mrs. Cassiday testified before the ALJ that Dr. Murray told her the operation afforded her a 50/50 chance of "getting better" (Tr. 51). If Dr. Romain's report to the agency and Dr. Murray's discussion with Mrs. Cassiday do not rise to the level of prescriptions, the remarks of the examining physician Dr. Donesa and the reviewing physician Dr. Oleynick add nothing. Dr. Donesa may not even be referring to the same procedure. He speaks of surgical intervention to relieve headaches and neck pain (Tr. 212); the focus of Dr. Romain's concern was blockage of the subclavian arteries and "sleepiness" of the hands and arms on both sides (Tr. 197).

█ Without any evidence tying the surgery to restoration of Mrs. Cassiday's ability to work or any indication that surgery had ever been prescribed rather than recommended or discussed, the issue of the justification for Mrs. Cassiday's refusing to have surgery need not, strictly speaking, be reached. Nonetheless we are disturbed by the treatment given this issue by the ALJ. Mrs. Cassiday told him (Tr. 51) that she had decided against the surgery on the basis of Dr. Stallman's advice:

[Dr. Stallman] said that normally people are worse when they—if they have to have ribs removed, just plain ribs in your sides he said, then that would be worse than around your heart like that and he said that he didn't, if he were me, he didn't think he would have it done, cause he said it probably would just be worse.

The ALJ found that "a reasonable individual would have accepted the recommendation of the specialist for surgery, or would have sought an additional opinion rather than relying on the contrary opinion of a less qualified general practitioner" (Tr. 15). On the contrary, we think that Mrs. Cassiday was entitled to put her trust in a doctor whose recommendation was strong and unqualified and whose knowledge of her general condition was based on a doctor-patient relationship of fifteen years' standing. Accord, *Nichols v. Califano*, 556 F.2d 931, 933 (9th Cir. 1977).[7]

## II

It is the conclusion of this Court that the Secretary's decision to terminate Mrs. Cassiday's disability benefits was not based on substantial evidence in the record. Nor was there substantial evidence to bring this case within the regulation that deals with willful refusal of prescribed treatment. Accordingly, we reverse the judgment of the district court in favor of the Secretary. In addition, since the Secretary is free to conduct periodic re-examinations of Mrs. Cassiday's condition, there is no purpose in remanding for additional agency proceedings. We direct the Secretary to reinstate Mrs. Cassiday's disability benefits until such time as he can show by substantial evidence that she is capable of sustained gainful employment.

---

7. In holding that Mrs. Cassiday was not required to undergo surgical removal of her ribs, we are in accord with several other courts: *Schena v. Secretary of Health and Human Services*, 635 F.2d 15 (1st Cir. 1980) (claimant not required to undergo recommended spinal surgery); *Young v. Califano*, 633 F.2d 469 (6th Cir. 1980) (claimant not required to undergo myelogram and surgery for ruptured disc, where procedures were recommended but not prescribed and chance of success was 50%); *Blankenship v. Califano*, 598 F.2d 1041 (6th Cir. 1979) (claimant not required to undergo surgery with 50–60% chance of success); *Nichols v. Califano*, 556 F.2d 931 (9th Cir. 1977) (claimant's refusal to have third operation, where two earlier ones had failed, not willful). *See also McCarty v. Richardson*, 459 F.2d 3 (5th Cir. 1972) (hyperthyroidism not disabling condition; but if claimant's refusal to undergo "relatively low risk corrective surgery" had been sole basis for disentitlement "we would be inclined to reverse and order restoration of benefits," 459 F.2d at 4).