**Robert D. SHARP, Plaintiff,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 88–1889.**

United States District Court,
W.D. Pennsylvania.

Feb. 1, 1989.

Robert N. Peirce, Jr., Pittsburgh, Pa., for plaintiff.

Albert Schollaert, Asst. U.S. Atty., for defendant.

## MEMORANDUM OPINION

COHILL, Chief Judge.

This case is before us on appeal from a final decision by the defendant Secretary of Health and Human Services denying the plaintiff Robert D. Sharp's claim for disability insurance benefits and Supplemental Security Income. The parties have submitted cross motions for summary judgment. For the reasons stated below, we will reverse the decision of the Secretary, and enter judgment in favor of the plaintiff and against the defendant.

## I. PROCEDURAL HISTORY

On July 24, 1986, the plaintiff applied for disability insurance benefits and Supplemental Security Income alleging that he had been disabled since November 24, 1978, due to uncontrollable diabetes and neurovascular disease. The Secretary denied the plaintiff's applications initially and on reconsideration. After a *de novo* hearing held on December 15, 1987, the Administrative Law Judge ("ALJ") determined that the plaintiff was not disabled. The Appeals Council declined to review the ALJ's decision on August 12, 1988, and this appeal followed.

## II. FACTS

The plaintiff was born on January 17, 1954. T. 33. Although he did not receive a high school diploma, he did receive a graduate equivalency diploma in 1976, after completing the eighth grade. T. 34. The plaintiff's most recent job was as a security guard. T. 35–36. His job duties consisted of patrolling the grounds of the facility, and lifting doors which weighed approximately sixty pounds. T. 53. The plaintiff last worked as a security guard in 1987 for three weeks. T. 39. During his employment, he developed an ulcer on his toe which required surgery. *Id.* Upon discharge, he was instructed to abstain from wearing shoes, and, as a result, the plaintiff terminated his employment. *Id.* Prior to his job as a security guard, he worked as a baker and a cook. T. 37.

The plaintiff suffers from diabetes with recurrent ketoacidosis. T. 41, 54, 62. Approximately three or four times a month, he goes into diabetic shock which lasts from a half a day to a day. T. 55. The diabetic shocks result in temper outbursts, shakiness, headaches, dehydration, frequent urination, dizziness, weakness, nausea, vomiting and blurry vision. T. 41–42, 54. In an attempt to control his diabetes, the plaintiff takes fifty units of NPH human insulin and ten units of regular insulin in the morning, and sixty units of MPH insulin in the evening. T. 39.

In addition, the plaintiff has neuropathy in his legs and stomach, a stomach ulcer, gastritis and duodenitis, stripping of multiple recurrent varicose veins primarily in his right leg, and an ulcer on his right big toe. T. 40–43, 62. His stomach ulcer, compounded by his diabetes, causes the plaintiff to vomit blood, and in an attempt to control the ulcer, he takes zantac. T. 41. His vomiting spells occur approximately three times per month, and they last for up to fifteen hours at a time. T. 42.

The plaintiff also testified that he has a mental disorder which causes him to "... just snap out. I'll just yell at (people) for really no, you know, purpose at all." T. 43. Although these temper outbursts occur about six times per month, as of the date of the hearing, the plaintiff was not undergoing psychiatric treatment or counseling. *Id.*

The plaintiff's urine retention problems prevent him from sleeping continuously through the night; he sleeps about four hours per night, and often naps during the day. T. 44. The plaintiff can walk three blocks and stand for forty minutes before his ankles and legs begin to swell. T. 44–45. However, he can sit without difficulty. T. 45. The heaviest object that he had lifted within a year of his hearing was his niece, who weighed twenty-six pounds. *Id.*

The plaintiff lives alone in an apartment, located across the street from his mother. T. 45. He does about half of his housework, including dusting, mopping, cooking and washing his clothes. T. 46. His mother or sisters do the other half of his cleaning. *Id.* He does a small amount of yardwork, and until a few months before the hearing, he drove his car several times a day. T. 47–48.

The plaintiff leads an active social life. He occasionally attends church, and the summer preceding the hearing, he went fishing approximately five times for two or three hours at a time. T. 49. The plaintiff is a train collector and enjoys playing cards. *Id.* In addition, he goes camping with his mother and likes to see movies. T. 50. The plaintiff is engaged to be married, and he and his fiancee visit his mother, brother and sisters on a regular basis. T. 51.

## III. MEDICAL EVIDENCE

A review of the medical evidence reveals that, since 1978, the plaintiff has been in the hospital approximately thirty times for treatment of his multiple physical and mental impairments. He was first hospitalized on November 24, 1978. T. 201. The plaintiff's physician reported that he was in obvious physical distress, and noted that the plaintiff had varicose veins in both lower extremities. *Id.* Commenting on the plaintiff's high dosage of insulin, the doctor explained that because the plaintiff refused to reduce his caloric intake to 2000 calories, he had to take higher dosages of insulin to control his diabetes. *Id.* The plaintiff was discharged on December 5, 1978. *Id.*

The plaintiff returned to the hospital on January 12, 1979. T. 211. He was diagnosed as having uncontrolled diabetes mellitus, varicosities of both legs, irritable bowel syndrome, antisocial personality and reactive depression. *Id.* The doctor stated that the plaintiff was an irritable and repulsive male who exhibited a resentful attitude towards the medical staff. T. 213. The plaintiff was discharged on January 31, 1979, with instructions to maintain an 1800 caloric diabetic diet, and to take forty units of NPH insulin. *Id.*

From February 2, 1979, until February 14, 1979, the plaintiff was in the hospital for uncontrolled severe diabetes mellitus and bilateral varicose veins. T. 235. He complained of severe abdominal pain, and underwent bilateral vein stripping. T. 236. In addition, he saw a psychiatrist who diagnosed him as a marked sociopathic personality. *Id.* T. 235.

The plaintiff's next hospitalization occurred on June 7, 1979, when the plaintiff complained of weakness and abdominal pain. T. 250, 253. After making threats of suicide, the plaintiff was transferred to the psychiatric unit, where he was treated by A.W. Hahn, M.D. T. 251. Dr. Hahn diagnosed the plaintiff as a sociopathic personality who had high dependency needs, and who intentionally refused to use his medication and control his diet in order to get attention. T. 251. He concluded that the plaintiff's diabetes was out of control because of his uncooperativeness. *Id.* He linked the plaintiff's mental impairment to his unstable diabetes, indicating that until the plaintiff received psychiatric treatment, his diabetes would remain unstable. *Id.* However, for unexplained reasons, Dr. Hahn recommended that the plaintiff refrain from immediately seeking mental health care. *Id.* Dr. Hahn discharged the plaintiff on July 17, 1979, and listed the plaintiff's prognosis for recovery as poor. T. 252.

On March 8, 1980, the plaintiff was hospitalized for out of control diabetes. T. 284. S. Zafar, M.D., reported that the plaintiff had varicose veins and urinary incontinence, and he noted that the plaintiff had a history of noncompliance and uncooperativeness in controlling his disease. T. 285. The plaintiff left the hospital ten days later.

On April 22, 1980, the plaintiff had not taken his insulin, nor eaten for two days. He developed diarrhea and vomiting and was admitted to Butler County Memorial Hospital. T. 286. The plaintiff's treating physician reported that the plaintiff was extremely uncooperative, and that his men-

tal problem complicated effective management of his physical impairment. *Id.* The plaintiff was released on May 19, 1980. *Id.*

On December 9, 1980, the plaintiff was admitted to St. Francis General Hospital with diabetic ketoacidosis. T. 299. Dr. Zafar noted that the plaintiff had a severe compliance problem, and that his prognosis for recovery was fair at best. T. 300. In addition, the doctor reported that the plaintiff had a history of peptic ulcer disease. *Id.* The plaintiff was discharged on December 19, 1980.

The plaintiff was admitted to Fulton County Medical Center on February 27, 1981, with diabetic ketoacidosis, a peptic ulcer and a small scrotal abscess. T. 301. The doctor reported that the plaintiff was in acute respiratory distress and diabetic ketoacidosis. The plaintiff stated that he had been nauseous for two days, and thus had failed to take his insulin. *Id.* The plaintiff's condition was stabilized with no complications, and on March 6, 1981, the plaintiff was discharged in an improved condition. *Id.*

On May 4, 1981, the plaintiff again went to Fulton County Medical Center to receive treatment for his severe diabetic ketoacidosis. T. 313. The plaintiff stated that he awoke that morning feeling ill, and ate very little. T. 315. However, he took his insulin. Later that day he began vomiting and experiencing abdominal pain. *Id.* He was diagnosed as having diabetic ketoacidosis, gastritis and an upper respiratory infection. The plaintiff was discharged on May 15, 1981. *Id.*

The plaintiff's next hospital admission occurred on June 28, 1981, at which time he underwent varicose vein stripping on the right leg. T. 332. He was discharged on July 8, 1981, with instructions to report back to the doctor on July 16, 1981. T. 333. The doctor anticipated that the plaintiff would undergo the same treatment on his left leg in four to six weeks. *Id.*

On August 15, 1981, the plaintiff was readmitted to the hospital for recurrent varicose veins of the right leg. T. 336. He underwent ligation and stripping of the veins on August 17, 1981, at which time an epithelioma of the left groin was excised. T. 337. On August 28, 1981, the doctor performed a cystoscopic examination and discovered a hemorrhagic cyst with posterior urethritis and a neurogenic bladder. *Id.* In addition, the doctor reported that the plaintiff became depressed and suicidal and received psychiatric treatment. *Id.* On September 9, 1981, the plaintiff was discharged. T. 338.

The plaintiff was next admitted to the hospital on March 2, 1982, at which time he was diagnosed as having uncontrolled diabetes mellitus and streptococcal pharyngitis. T. 340. Dr. Zafar noted that the plaintiff was highly noncompliant, and he doubted that the plaintiff would report for his follow-up examination. *Id.* The plaintiff was discharged on March 8, 1982.

On March 14, 1982, the plaintiff went to the hospital to have a tonsillectomy performed and on March 17, 1982, he was discharged. T. 342.

After a one year hiatus, the plaintiff returned to the hospital on August 31, 1984, complaining of dizziness, nausea, blurry vision, headaches, vomiting, weakness and fatigue. T. 344. The doctor diagnosed the plaintiff as having diabetes mellitus and diabetic neuropathy of the lower extremities. *Id.* He was discharged on September 6, 1984.

One week later, on September 14, 1984, the plaintiff went to the hospital emergency room, complaining of abdominal pain and very loose stools. T. 346. The doctor noted that the plaintiff was very combative. *Id.* The plaintiff was discharged on September 18, 1984.

On August 22, 1985, the plaintiff voluntarily went to St. Francis Hospital for depression, poor impulse control, and threatening behavior. T. 348. The plaintiff stated that he had been undergoing treatment for depression for the last seven months at St. Margaret's hospital, and that he was taking norpramin, an antidepressant medication, to control his depression. According to the plaintiff, a violent argument with his wife triggered his admission. *Id.*

William E. Mooney, M.D., the plaintiff's attending physician, stated that the plaintiff was angry, agitated, and experienced delusional thinking and homicidal ideations. T. 349. Dr. Mooney prescribed trilafon, an antipsychotic medication. The plaintiff attempted to voluntarily leave the hospital, but because he was delusional, angry and had some homicidal ideations, a court committed him to ten days of in-patient care. Id. After his period of commitment ended, the plaintiff signed a voluntary treatment form for evaluation. He was diagnosed as having a dysthmic disorder and a passive-dependent-aggressive personality disorder. Id. The plaintiff returned home on September 10, 1985.

On August 29, 1985, Leon Ford, Ph.D., a clinical psychologist, reported that the plaintiff admitted himself to the hospital after assaulting his wife during an argument. T. 357. Dr. Ford noted that the plaintiff was unaccepting of his diabetes, and was out of control and combative. The plaintiff told Dr. Ford that he had a nervous breakdown after his first marriage ended, and that he was depressed over the break-up of his second marriage. Id. Dr. Ford concluded that the plaintiff had some delusional thoughts about his marriage, but that he did not have any formal thought disorder. T. 359. Moreover, Dr. Ford felt that the plaintiff had a paranoid disorder, but that he did not suffer from profound depression or schizophrenia. Id.

In 1986, the plaintiff spent approximately fifty-five days in the hospital for treatment of his diabetic ketoacidosis. His first admission was on May 16, 1986. T. 363. During his stay at the hospital, the plaintiff belligerently refused to take insulin and follow a diabetic diet. He often snacked at night, and his behavior prolonged his stay. He was discharged on May 24, 1986, with instructions to follow-up in the Family Health Center in two weeks. T. 364. The plaintiff was diagnosed as having diabetic ketoacidosis, insulin dependent diabetes mellitus, noncompliance and a borderline personality. Id.

On June 28, 1986, the plaintiff was admitted to the hospital with diabetes ketoaci-dosis and was discharged one week later. T. 370. On July 14, 1986, the plaintiff was again admitted to the hospital with diabetes ketoacidosis. T. 367. The doctor noted that he was a borderline personality who denied noncompliance. He was discharged on July 22, 1986.

Donald J. Coleman, M.D., a psychiatrist, examined the plaintiff on September 10, 1986. T. 373. Noting that the plaintiff exhibited a peculiar demeanor, the doctor commented that the plaintiff did not look at him more than once or twice throughout the fifty minute evaluation. Id. Furthermore, Dr. Coleman reported that the plaintiff had a rebellious, oppositional attitude, and that his mood was one of mild depression, anger and self-victimization. T. 374, 376.

The doctor stated that the plaintiff was goal-directed, logical, and that he was not preoccupied with suicide, obsessions or phobias. T. 376. Furthermore, the plaintiff had average intelligence, good impulse control and fairly good judgment. T. 377. Dr. Coleman diagnosed the plaintiff as having an atypical personality disorder characterized by antisocial and stubborn behavior and some depressive affect in his mood. Id. The doctor opined that the plaintiff's prognosis for recovery was poor. Id.

An evaluation of the plaintiff's functional restrictions revealed that his activities of daily living were moderately limited, and that his social functioning skills were impaired. T. 379, 380. In addition, the plaintiff sustained sufficient focused attention, but he had poor ability to adapt to stressful circumstances. T. 381, 382.

On October 2, 1986, the plaintiff was hospitalized for diabetic ketoacidosis. T. 384. Helen Thornton, M.D., wrote that the plaintiff's personality disorder and lack of compliance with his medical regimen greatly complicated his ability to effectively manage his disease. Id. She doubted that the plaintiff would ever have good control over his disease until he addressed his underlying personality disorder. Id. However, she noted that the plaintiff's attempt to correct his personality disorder on several occasions had been unsuccessful. Id.

The plaintiff was discharged on October 6, 1986. Five days later, on October 11, 1986, the plaintiff was again admitted to the emergency room for diabetic ketoacidosis. T. 387. He was discharged on October 15, 1986.

The plaintiff went to the hospital emergency room on October 19, 1986, complaining of abdominal pain, nausea, vomiting and diarrhea. T. 390. He was given insulin and bentyl and discharged four days later on October 23, 1986.

On November 5, 1986, the plaintiff was admitted to the hospital and diagnosed as having diabetic ketoacidosis, diabetic neuropathy, gastritis, duodenitis and borderline personality. T. 392. He was discharged on November 17, 1986. A. Stine, M.D., commented that, "it is very difficult to deal with this person secondary to personality and to dangerous disease." T. 393. The plaintiff returned to the hospital on November 25, 1986, and a doctor (signature illegible) diagnosed him as having diabetic ketoacidosis, sinusitis and personality disorder. T. 413. He left two days later.

The plaintiff entered the hospital five times in 1987. His first admission was on January 1, 1987, when he was diagnosed as having diabetic ketoacidosis, insulin-dependent diabetes mellitus, viral bronchitis, anxiety disorder, varicose veins and a history of noncompliance with medications as well as multiple discharges against medical advice from the emergency room. T. 460. He was discharged on January 11, 1987. The doctor reported that the nursing staff had witnessed the plaintiff purchasing candy and hamburgers from the hospital cafeteria. In addition, he stated that the plaintiff had refused to quit smoking, and had refused to make an eye examination appointment and a diabetic counseling appointment. T. 461.

The plaintiff's second hospitalization in 1987 occurred on March 9, when he underwent vein ligation and stripping in both legs. T. 426. He was discharged three days later with instructions to refrain from sitting, standing, walking or lying in one place too long. T. 427. The plaintiff revisited the hospital on March 31, 1987, and was diagnosed as having diabetic ketoacidosis, dehydration, diabetic retinopathy, diabetic neuropathy, hypomagnesemia, and hypophosphatemia. T. 444. The plaintiff was discharged on April 3, 1987.

The plaintiff returned to the hospital on May 5, 1987, for diabetic ketoacidosis. T. 485. Gail Kubrin, M.D., stated that the plaintiff continued to exhibit symptoms of his personality disorder as he was very negative, hostile and had difficulty with follow-up. T. 486. She opined that the plaintiff's personality disorder would continue to affect the plaintiff's physical illness. *Id.* Finally, Dr. Kubrin noted that the plaintiff's toe ulcer had improved with very superficial lesion and no drainage. *Id.*

The plaintiff's final hospitalization in 1987 occurred on June 13, when he was admitted for diabetic ketoacidosis. T. 501. The doctor reported that the plaintiff had factitiously used his insulin; the nursing staff had observed the plaintiff inject his insulin into his pillow. T. 502. He was discharged five days later on June 18, 1987.

The last evidence of record concerns the plaintiff's hospital admission on January 6, 1988, when he was diagnosed as having osteomyelitis, an ulcer on his right great toe, diabetes mellitus and personality disorder. T. 519. He had a surgical procedure performed on his infected great toe on the left foot. T. 563. On January 24, 1988, Dr. Varma wrote that the plaintiff was very resistent to treatment and had a major personality problem. T. 561. He felt that the plaintiff's compliance would never improve, and therefore, the plaintiff's prognosis was very guarded. *Id.* Dr. Varma also felt that the plaintiff's stress could be contributing to his high blood sugars. *Id.* The plaintiff was discharged from the hospital three weeks later on January 26, 1988.

## IV. DISCUSSION

### A. *Standard of Review*

To receive disability benefits, the Secretary must adjudge the claimant disabled. 42 U.S.C. 423(a)(1)(C). A claimant is disabled if he is unable to engage in "any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

■ Once the claimant makes a *prima facie* showing of an impairment which precludes him from performing his past work, the burden shifts to the Secretary to demonstrate that the claimant has the capacity to perform alternative jobs. *Gilliland v. Heckler*, 786 F.2d 178, 180 (3d Cir.1986). The Secretary must consider the claimant's age, education and work experience when he makes this determination. 42 U.S.C. 423(d)(2)(A). In addition, the Secretary must demonstrate not only that the claimant has the ability to perform alternative jobs, but that they exist in significant numbers in the claimant's region or in the several regions of the country. *Id.*

To clarify and formalize the adjudicative process, the Social Security Administration has promulgated regulations which establish a five-step evaluation process to determine whether a claimant is disabled. 20 C.F.R. 404.1520(a). If at any point in the evaluation process the ALJ determines that the claimant is or is not disabled, the inquiry must end. *Id.*

Under the analysis, the ALJ must decide: (1) whether the claimant is currently engaged in substantial gainful employment; (2) if not, whether the claimant has a severe impairment; (3) if he does have a severe impairment, whether the impairment meets or equals one of the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1; (4) if it does not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if his impairment does prevent him from performing his past job, whether the claimant is able to engage in other forms of substantial gainful activity, considering his age, education, prior work experience and residual functional capacity. The claim is approved if the claimant cannot perform other kinds of work. 20 C.F.R. 404.1520.

The medical vocational guidelines are used to determine whether the claimant is disabled if the ALJ reaches the fifth step in the evaluation process. 20 C.F.R., Pts. 404–416, Subpts. P, I, App. 2. In order to use the guidelines, the ALJ must make findings of fact regarding the claimant's age, education and work experience. 20 C.F.R. 404.1568, 416.960–68. In addition, the ALJ must assess the claimant's residual functional capacity. 20 C.F.R. 404.1545, 416.945.

However, when a claimant presents evidence of both exertional and nonexertional (mental, sensory or skin) impairments, the guidelines are inapplicable, and the ALJ must make findings of fact regarding how much the nonexertional limitations diminish the claimant's work ability. 20 C.F.R. 404.-1545, 416.945. In addition, the ALJ must identify specific jobs that the claimant is capable of performing. 20 C.F.R. 404.-1520(f), 416.9210(f). This finding is preferably done with the assistance of vocational expert testimony.

Although the evaluation process applies to both physical and mental impairments, the regulations require the ALJ to follow a special procedure to evaluate the severity of mental impairments. 20 C.F.R. 404.-1520a, 416.910a. First, the ALJ must review the mental status examination and psychiatric history of the claimant to determine whether a mental impairment exists. *Id.* If the ALJ finds that a mental impairment exists, the second step requires the ALJ to determine the severity of the impairment as it affects the claimant's ability to work. *Id.* The Social Security Administration assesses severity by the degree to which the impairment imposes functional limitations on the claimant's ability to work. *Id.*

The Social Security Administration has identified four areas of function which are considered essential to the ability to work. 20 C.F.R. Pt 404, Subpt. P, App. 1. The first area is "activities of daily living." This area requires the ALJ to determine the claimant's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills. *Id.* Under the second

criterion, "social functioning," the ALJ must determine whether the claimant can interact appropriately and communicate effectively and clearly with others. *Id.* The third function, "concentration, persistence and pace," refers to the claimant's ability to sustain focused attention sufficiently long to permit the timely completion of tasks found in work settings. *Id.* The final function, "deterioration or decompensation in work or work-like settings," refers to the claimant's ability to tolerate increased mental demands associated with competitive work. *Id.*

The ALJ is required to rate the degree of limitation in each of the four functions to determine whether the impairment is severe. 20 C.F.R. 404.1520a(c), 416.920a(c). If the mental impairment is severe, the ALJ must then decide whether it meets or equals a listed mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the functional criteria have been limited. *Id.* If it does not meet a listed mental disorder, the ALJ must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. 20 C.F.R. 404.1520a(c)(3), 416.920a(c)(3).

■ In reviewing the Secretary's decision to deny benefits to the plaintiff, we must decide: (1) whether the Secretary applied the correct legal standards; and (2) whether the Secretary's findings of fact are supported by substantial evidence. *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir.1988). The United States Court of Appeals for the Third Circuit has defined substantial evidence as "such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981). Accordingly, we must scrutinize the entire record to determine whether the plaintiff's claim has been fairly evaluated and the law has been correctly applied. If the Secretary applied the correct legal standards and if his findings of fact are supported by

substantial evidence, then we must affirm his decision to deny disability benefits.

On his motion for summary judgment, the plaintiff requests a reversal of the Secretary's determination on the ground that it is not supported by substantial evidence. Specifically, the plaintiff contends that (1) the vocational expert's testimony did not constitute substantial evidence so as to rebut the clear medical evidence of his disability, and (2) the ALJ erred in finding that the plaintiff is disqualified from receiving disability benefits because his disease was remediable.

In support of his own motion for summary judgment, the Secretary argues that the ALJ's decision is supported by substantial evidence.

### B. *The ALJ's Findings and Decision*

In his opinion, the ALJ found that, although the plaintiff was suffering from uncontrollable diabetes secondary to noncompliance, diffuse neuropathy, gastritis and duodenitis, varicose veins and an atypical personality disorder, his impairments or combination of impairments did not meet or equal the relevant listings. T. 19. The ALJ thus considered the plaintiff's vocational factors and concluded, based on the opinion of a vocational expert, that the plaintiff retained the ability to perform his past relevant work as a security guard. *Id.* Alternatively, the ALJ found that the plaintiff retained the residual functional capacity to perform medium exertional jobs, and that such jobs existed in significant numbers in the national economy. *Id.* Accordingly, the ALJ made express factual findings through the fifth step of the evaluation process and concluded that the plaintiff was not disabled. T. 20.

The ALJ's conclusion is fatally flawed in three respects. First, the ALJ relied entirely on defective expert testimony for his determination that the plaintiff retained the capacity to perform medium exertional work. Second, the ALJ failed to give sufficient weight to the plaintiff's testimony regarding the severity of his symptoms. Finally, the ALJ, in finding that the plaintiff's physical impairments were remedia-

ble, failed to consider the effects of the plaintiff's mental impairments on his ability to alleviate or control his physical impairments. Although each of these errors would dictate a remand to the Secretary for reconsideration, the combination of these wrongs coupled with a fully developed record leads us to conclude that the Secretary would be unable to develop a record that would support a finding of no disability. Accordingly, we will reverse the judgment of the ALJ and award disability benefits to the plaintiff.

■ The ALJ's first error was his total reliance on the testimony of a vocational expert for his conclusion that the plaintiff was not disabled. T. 16. After attending the hearing and reviewing the medical reports, a vocational expert, William Houston Reed, Ph.D., testified that, although the plaintiff could not return to his past relevant work as a baker or a cook, he could perform his past relevant work as a security guard. T. 65. However, Dr. Reed explained that the plaintiff could only perform those security guard positions which involved sitting at a television monitor, and which did not involve making rounds and having public contact. *Id.* In addition, Dr. Reed opined that the plaintiff could perform other jobs existing in the national economy such as a laundry sorter, produce sorter, produce picker and order clerk.

Dr. Reed's answers were based on the following hypothetical question asked by the ALJ:

First, I want you to assume that I'll make the following findings regarding the claimant, that he is age 33, will be 34 in approximately three or four weeks, his sex is male, educational experience is as follows, he completed the eighth grade and later received a graduate equivalency diploma. His past relevant work is as a baker at a bakery, a cook at a fast food restaurant and a security guard. His impairments are as follows, from a physical standpoint, he suffers from diabetes with recurrent ketoacidosis. I want you to assume that I will credit the record in the following respect, that the recurring ketoacidosis is the result of

two things. Number one, non-compliance with the prescribed diet and number two, not following the administration of insulin as prescribed. He has some defuse neuropathy in the lower extremities however his gate and motor strength and power are normal. Number two, he has a history of gastritis and duodenitis which has been treated and controlled with zantac and other antacids and number three, he is status post the litigation and stripping of multiple recurrent varicose veins predominantly in his right leg. From a mental standpoint, he suffers from an atypical personality disorder with some depressive affect. There's also anti-social, stubborn and oppositional type of behavior. Now, this hypothetical individual would have the following capabilities regarding work performance. From an exertional standpoint, I want you to assume initially that he could lift 50 pounds occasionally and 25 pounds frequently. Now, from a non-exertional standpoint, I want you to assume that I would credit Exhibit 39, the report of Doctor Coleman a psychiatrist in the following respect. As I mentioned, there is some depressive effect, anti-social and stubborn and oppositional type of behavior. In Dr. Coleman's view this type of individual would be limited in the following respect. He would be limited to jobs that would involve a stable content of job duties. That is a job that would not have changing duties. Number two, a job, a job he would be limited to jobs that would not involve either strict or tight deadlines or schedules. For example, he would be precluded from jobs that would be incentive type jobs or jobs that require production type of standards. Number three, a job that would provide very little, if any, conflict, and number four, a job that would involve very little or minimal public contact, content or contact. In fact, Dr. Coleman says that he probably would work best if he worked alone.

T. 62–63.

In disability determination proceedings, the ALJ often poses one or more hypothetical questions to a vocational expert in order

to determine the extent to which the plaintiff can perform substantial gainful activity. Although such questioning by the ALJ is acceptable and encouraged, the ALJ may rely upon the vocational expert's testimony regarding a claimant's ability to perform substantial gainful activity only if the questions correctly portray the claimant's physical and mental impairments. *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).

In the instant case, the vocational expert based his conclusions on a hypothetical which did not accurately reflect the plaintiff in two respects. First, the hypothetical was based on an individual who could provide an employer with continuous employment. However, the overwhelming and uncontradicted medical evidence demonstrates that the plaintiff is incapable of providing such employment. Approximately three or four times a month, the plaintiff experiences diabetic shock, which lasts from a half a day to a day. These episodes are characterized by vomiting, blurry vision, temper outbursts, shakiness, headaches, frequent urination and dehydration, and they often result in hospitalization. It is doubtful that a person suffering from these symptoms could provide an employer with continuous work.

In addition, since 1978, the plaintiff has been in the hospital some thirty times— over twenty-two times for recurrent diabetic ketoacidosis, and an additional eight times for his other maladies. His hospital stays lasted, on average, seven days. The plaintiff's condition has not improved; the plaintiff was hospitalized for a total of fifty-five days in 1986, twenty-six days in 1987, and in 1988, at least twenty days. Finally, the plaintiff testified that his urinary retention problems prevent him from sleeping a full night, and that he often must nap during the day.

■ The ability to engage in substantial gainful employment means the ability to do the physical and mental acts required in the job through continuous attendance in a regular work week. *Dobrowolsky v. Califano,* 606 F.2d 403, 408 (3d Cir.1979). The ALJ's failure to include these impairments in his hypothetical rendered the vocational expert's testimony defective, because it did not afford the vocational expert an opportunity to evaluate how these problems would bear on the plaintiff's ability to maintain employment.

Moreover, in failing to present the vocational expert with a hypothetical of a plaintiff who suffered from diabetic shock episodes three times a month, the ALJ understated the plaintiff's physical limitations on his ability to work. The ALJ's characterization of the plaintiff's physical condition was incomplete, because it failed to include eight specific impairments: dizziness, blurry vision, frequent headaches, vomiting, shakiness, frequent urination, temper outbursts and dehydration. These impairments are medically undisputed and could seriously affect the plaintiff's ability to engage in substantial gainful activity.

The ALJ's finding that the plaintiff could perform his past relevant work and/or medium exertional jobs existing in the national economy, based entirely on the vocational expert's conclusions, is not founded on substantial evidence. Hypotheticals posed to a vocational expert must accurately portray the plaintiff's individual physical and mental impairments. *Podedworny, supra,* 745 F.2d at 218. Here, the ALJ failed to include the plaintiff's numerous hospital admissions, as well as the impairments which resulted from the plaintiff's frequent diabetic shock episodes. Accordingly, because of the insufficient hypothetical and the corresponding deficient answer, we cannot regard the vocational expert's testimony or the ALJ's conclusions based on that testimony as substantial evidence.

■ Moreover, it is not enough for an ALJ to base his sole decision on the conclusions of a vocational expert without furnishing any explanation concerning the relative weight and credibility of the evidence before him. *Dobrowolsky, supra,* 606 F.2d at 409. The ALJ never explained why he rejected the testimony of the plaintiff regarding his subjective symptomology and ability to perform substantial gainful activity, nor did he explicitly state what medical evidence he was relying on to support his conclusion that the plaintiff was not dis-

abled. Although we cannot second guess the ALJ's reasoning, remand is unnecessary when the record provides substantial and uncontradicted evidence of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Podedworny, supra,* 745 F.2d at 213.

██ The evidence presented before the ALJ warrants a finding that the plaintiff was totally disabled due to his diabetes and neurovascular disease. The overwhelming evidence in the record reveals that the plaintiff suffers from uncontrollable diabetes, resulting in frequent diabetic shock episodes and regular hospital admissions. In addition, the medical evidence indicates a general deterioration in the plaintiff's health as demonstrated by his recurrent gastritis, varicosities and diabetic ulcers.

Section 423(d)(5) of the Social Security Act requires the Secretary to consider the plaintiff's subjective complaints of pain or other symptoms when such complaints are substantiated by medical findings demonstrating the existence of an impairment which could be expected to produce the alleged pain or symptoms. 42 U.S.C. 423(d)(5). If the intensity and persistence of pain is of such severity as to preclude the claimant from performing any work, he must be found disabled. *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir. 1984).

The testimony of the plaintiff reveals that he suffers from severe uncontrollable diabetes, characterized by vomiting, blurry vision, weakness, frequent urination, headaches, dehydration, nausea and dizziness. T. 41–42, 54. These symptoms occur three to four times a month and often result in hospitalization. Consequently, his activities are severely restricted. He spends most of his day watching television and sitting. T. 40. He is unable to stand or walk for extended periods of time because his legs swell and begin to ache. T. 44–45. He is unable to lift heavy objects and has difficulty performing housework. *Id.* We do not believe that these are the activities of someone who has the ability to engage in sustained medium exertional work.

The plaintiff does enjoy a sporadic social life; he occasionally visits his brothers and sister and sees a movie with his mother. T. 48–49. However, this lifestyle does not contradict a claim of disabling pain. *Smith v. Califano,* 616 F.2d 968, 971 (3d Cir.1980). Moreover, the plaintiff's testimony regarding the existence and effect of his symptoms on his daily activities is entirely consistent with what he told his doctors.

The plaintiff's complaints of disabling symptoms are supported by medical evidence demonstrating the existence of an impairment which could reasonably be expected to produce the symptoms that he experiences. The plaintiff has been hospitalized over twenty times for ketoacidosis, a form of uncontrolled diabetes. It is well documented that the symptoms of ketoacidosis are those associated with the diabetic shock attacks that the plaintiff experiences. *The Merck Manual* 1042 (R. Berkow, M.D. 14th ed. 1982). Moreover, all of the medical reports list the plaintiff's symptoms as severe abdominal pain, vomiting, blurry vision and dizziness. Finally, the plaintiff's severe varicose veins cause swelling and tenderness in his legs, resulting in his inability to stand or walk for long periods of time.

"Testimony of subjective pain and inability to perform even light work is entitled to great weight when it is supported by competent medical evidence." *Dobrowolsky, supra,* 606 F.2d at 409. In the instant case, the plaintiff's complaints of pain were manifested, not only by complaints to his physicians, but by numerous hospitalizations and surgical procedures. While each of the plaintiff's impairments and symptoms, when analyzed in isolation, may not have prevented him from engaging in substantial gainful activity, their cumulative impact certainly had such an effect.

In light of the plaintiff's testimony and supporting medical evidence, we conclude that the plaintiff's impairments seriously affected his ability to engage in his prior work as a security guard. The plaintiff's condition precludes him from standing or walking for any significant length of time. In addition, the uncontradicted medical evi-

dence reveals that the plaintiff has an atypical personality disorder which causes him to uncontrollably explode and which prevents him from handling stressful circumstances. T. 377, 381–82. We fail to see how the plaintiff could be a security guard, even one who sits at a monitor all day, the duties of which include being alert, prepared and capable of quickly responding to emergency situations.

In addition, the plaintiff's regular hospitalizations and frequent episodes of diabetic shock seriously hampered his ability to provide an employer with continuous employment. In fact, the plaintiff attempted to work as a security guard in 1987 before applying for disability benefits. He could only work for three weeks before he required hospitalization due to a diabetic ulcer on his right foot. T. 39. Since the plaintiff could not have provided an employer with continuous attendance throughout the work week, we find that the plaintiff did not have the capacity to perform any substantial gainful activity. *See Dobrowolsky, supra,* 606 F.2d at 408.

Since the plaintiff met his burden, the burden of proof shifted to the Secretary to demonstrate that given his age, education and work experience, the plaintiff has the capacity to perform specific jobs that exist in the national economy. Although the Secretary attempted to show this through the use of a vocational expert, as we have discussed above, the hypothetical presented to the expert was seriously defective. In addition, the expert testified that an individual who experienced blurry vision or had to take frequent naps during the day would not be able to perform substantial gainful activity. Thus, the Secretary has failed to meet this burden, as he has failed to produce record evidence which demonstrates that given the plaintiff's condition, including his subjective symptomology, he is capable of performing alternative employment.

The plaintiff's final contention is that the Secretary's decision to deny benefits was implicitly based on the presumption that his diabetes was within his control and thus could not be considered a disabling condition pursuant to 20 C.F.R. 404.-1530. This assumption is based on the ALJ's statement that:

> Objective medical evidence documented in the record establishes that the claimant's recurrent ketoacidosis is the result of the following two causes: (1) his non-compliance with a prescribed diet; and (2) his non-compliance with the medication regimen (Insulin) prescribed by his physicians. Pursuant to 20 C.F.R. 404.-1530 and 416.930, if an individual does not follow prescribed treatment without a good reason, he will not be found 'disabled' within the meaning of the Social Security Act.

T. 12.

The plaintiff's belief is strengthened by the fact that the ALJ, when analyzing the medical evidence in his opinion, repeatedly emphasized the plaintiff's noncompliance with his medical regimen. Moreover, in his motion, the Secretary devotes a considerable amount of time arguing that even if the plaintiff is disabled, he would still not be entitled to receive disability benefits because he has refused to follow medical treatment prescribed by his physicians.

Although the ALJ did not make an express finding that the plaintiff should be denied benefits because of his noncompliance with prescribed medical treatment, it is clear that the ALJ's decision to deny benefits was colored by his express finding that the plaintiff repeatedly refused prescribed medical treatment.

Pursuant to 20 C.F.R. 404.1530, a claimant may be denied disability benefits if the Secretary finds that he unreasonably failed to follow prescribed treatment and that if he had followed the treatment, his ability to work would have been restored. In reviewing whether a claimant's failure to undertake treatment will preclude the recovery of disability benefits, courts have considered four elements: 1) the treatment at issue must be expected to restore the claimant's ability to work; 2) a physician must have prescribed the treatment; 3) the claimant must have refused the treatment; and 4) the claimant's refusal must have been without justifiable excuse. *Teter v.*

*Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985); *Jones v. Heckler*, 702 F.2d 950, 953 (11th Cir.1983); *Cassiday v. Schweiker*, 663 F.2d 745, 749 (7th Cir.1981).

In the instant case, substantial evidence exists to support an affirmative finding on the first three elements. Although one doctor has suggested that the plaintiff's blood sugar levels could not be controlled by insulin, the overwhelming medical evidence indicates that the plaintiff would be able to control his diabetes if he took his prescribed insulin and followed his prescribed diabetic diet. Indeed, on every occasion that the plaintiff was hospitalized for diabetic ketoacidosis, his condition was eventually stabilized following several days of controlled insulin and dietic treatment. In addition, the extensive medical reports document the existence of the plaintiff's severe compliance problem; he injects his insulin into his pillow instead of his arm, and he eats a 3500 calorie "junkfood" diet, instead of a well-balanced 1800 calorie diabetic diet. Many doctors have concluded in their medical reports that the plaintiff's diabetes was out of control due to his refusal to follow his treatment.

However, each doctor also stated that the plaintiff's uncooperativeness was due to a severe underlying personality disorder which prevented him from acting rationally. Dr. Hahn, a psychiatrist, reported that until the plaintiff received psychiatric treatment, his diabetes would remain unstable. T. 251. In addition, the doctor concluded that the plaintiff was extremely uncooperative, and that his mental problems complicated effective management of his physical impairment. *Id.* Similarly, Dr. Helen Thornton drew a link between the plaintiff's underlying personality disorder and his lack of compliance with his medical regimen, noting that the plaintiff's attempts to correct his mental impairment had been unsuccessful. T. 384. Finally, Dr. Varma opined that it was unlikely that the plaintiff's compliance problem would ever improve, and therefore, listed his prognosis as guarded. T. 561.

Section 404.1530(c) of the regulations permits a claimant to refuse prescribed medical treatment without losing his entitlement to disability benefits, if he has a justifiable reason for refusing treatment. 20 C.F.R. 404.1530(c). Some examples of justifiable cause are: the treatment is contrary to the claimant's religious beliefs; similar surgery was previously unsuccessful; the surgery is very risky; or the surgery involves amputation of an extremity. *Id.*

Although some courts have used an objective standard when analyzing whether a claimant's refusal of prescribed treatment is reasonable or justifiable, the majority of courts use a more lenient, subjective standard. *Johnson v. Secretary of Health and Human Services*, 794 F.2d 1106, 1113 (6th Cir.1986); *See also Stone v. Harris*, 657 F.2d 210, 215 (8th Cir.1981) (holding that, "the proper question for the agency is not whether Stone's obesity is in some clinical sense remediable, but whether her obesity is the sole cause of her disabilities, and, if so, whether her obesity is reasonably remediable by her."). Courts are even more likely to employ a subjective test when the claimant has a mental impairment. *See Benedict v. Heckler*, 593 F.Supp. 755, 761 (E.D.N.Y.1984) (holding that in cases involving the mentally ill, "justifiable cause" must be given a subjective definition).

■ We hold that in determining whether a claimant with a mental impairment has reasonably refused treatment, the question is whether he has justifiably refused in light of his psychological, social or other individual circumstances. We believe that this rule makes sense. An individual with a severe mental impairment quite likely lacks the capacity to be "reasonable." In addition, that individual may not have the same capacity to assess the risks and benefits of prescribed treatment as someone who is not affected by such an impairment.

The plaintiff has a long history of noncompliance with medical treatment. However, his mental impairment was diagnosed less than a year after his diabetes was initially diagnosed. Moreover, the medical evidence indicates that although the plaintiff has attempted to correct his personality disorder, his attempts have been unsuccess-

ful and will remain unsuccessful in the future. In 1979, Dr. Hahn indicated that the plaintiff needed long term mental health care, but that his prognosis for recovery was poor. T. 252. Six years later, in 1985, the plaintiff voluntarily admitted himself to the hospital for psychological evaluation after assaulting his wife. T. 348. The plaintiff's treating physician diagnosed the plaintiff as having a dysthmic disorder and a passive-aggressive personality disorder, and he too listed the plaintiff's prognosis for recovery as poor. T. 349. Finally, one year later, after the plaintiff had gone through seven months of therapy, Dr. Coleman, a psychiatrist requested by the Social Security Administration, stated that the plaintiff's prognosis for recovery was poor. T. 377.

In sum, the uncontradicted medical evidence establishes that the plaintiff suffers from a severe personality disorder which has affected, and will continue to affect, his ability to think and act rationally and to follow his prescribed insulin and diet regimen. Accordingly, justifiable cause exists for the plaintiff's noncompliance.

## V. CONCLUSION

The Court concludes that there is no substantial evidence to support the ALJ's determination that the plaintiff could perform his past relevant work as a security guard or medium exertional jobs that exist in the national economy. Furthermore, substantial evidence on the record does not exist to support the ALJ's conclusion that the plaintiff's noncompliance with prescribed medical treatment was unreasonable. Accordingly, the Secretary's determination denying benefits is reversed, and we will enter judgment in favor of the plaintiff and award disability benefits beginning August 25, 1979.

An appropriate Order will issue.