**Drewcilla N. BAILEY, Plaintiff,**

**v.**

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**3:14–cv–128 RP–SBJ**

United States District Court,
S.D. Iowa, Davenport Division.

Signed August 19, 2015

---

Michael Depree, Bowman & Depree LLC, Davenport, IA, for Plaintiff.

William C. Purdy, U.S. Attorney's Office, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, Judge, U.S. DISTRICT COURT

Plaintiff, Drewcilla N. Bailey, filed a Complaint in this Court on December 4, 2014, seeking review of the Commissioner's decision to deny her claim for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for benefits October 28, 2011. Tr. at 208–13. Plaintiff, whose date of birth is November 27, 1992 (Tr. at 208) was 20 years old at the time of the hearing on May 3, 2013, before Administrative Law Judge Robert Schwartz (ALJ). Tr. at 26–51. The ALJ scheduled a supplemental hearing on July 12, 2013, at which a medical advisor was called to testify. Tr. at 52–84. The ALJ issued a Notice Of Decision—Unfavorable on August 28, 2013. Tr. at 7–21. The Appeals Council declined to review the ALJ's decision on October 28, 2014. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity after October 28, 2011. At the second step, the ALJ found Plaintiff's severe impairment to be mild mental retardation. The ALJ went on to find that Plaintiff also has medically determinable impairments of ADHD and antisocial traits: "However, the claimant has not satisfied her burden of establishing that she has ADHD and/or a personality disorder that would be severe if she complied with reasonable treatment recommendations." Tr. at 12. The ALJ found Plaintiff's impairment is not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 13. At the fourth step, the ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to performing no more than simple, routine, and repetitive tasks on a sustained basis with only routine breaks. She is limited to no more than occasional contact with the general public and any tasks must not require sustained, close interaction with others. Any work should involve no more than ordinary and routine changes in work setting or duties.

The ALJ found that Plaintiff has no past relevant work. Tr. at 19. At the fifth step of the sequential evaluation, the ALJ found there is a significant number of jobs in the national economy which Plaintiff is able to perform. Examples of such jobs included hand presser, injection molding machine tender, and car washer. Tr. at 20. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which she applied. Tr. at 21.

## EVIDENCE REVIEW

On April 25 and 30, 1997, when she was 4 years old, Plaintiff underwent a psychological evaluation and underwent intelligence testing using the Wechsler Preschool and Primary Scale of Intelligence–Revised. Plaintiff scored a Performance IQ of 79, a Verbal IQ of 73, and a Full Scale IQ of 74. Tr. at 390–92.

On May 31, 2001, Ghada Hamdan–Allen, M.D. a psychiatrist at Vera French Community Mental Health Center, wrote a report for Disability Determination Services. The doctor noted that teachers had reported that when Plaintiff took the prescribed medication—Ritalin—that her behavior at school was entirely controllable. On Axis I, the doctor's diagnoses were: Attention Deficit Hyperactivity Disorder with good response to medication; and, Developmental Disorder in reading and probably language. Tr. at 388.

On July 9, 2001, Plaintiff was seen by Stephen Paul Singley, M.A., a licensed clinical psychologist. Tr. at 383–87. On the Wechsler Intelligence Scale for Children—III, Plaintiff scored a Verbal IQ of 80, a Performance IQ of 68, and a Full Scale IQ of 71. Tr. at 385. It was noted that Plaintiff had not taken her medication on the morning of testing, so the psychologist opined that the test scores might be at the bottom of Plaintiff's range of potential. Nevertheless, he opined that on retesting, Plaintiff's ability would produce a IQ range between 67 and 77, or possibly a bit higher. On Axis I, the diagnosis was Attention–Deficit/Hyperactivity Disorder with Combined Type (by history and clinical impression). The doctor also diagnosed phonological disorder[1], moderate severity. On Axis II, borderline intellectual function was diagnosed. Tr. at 386.

On October 1, 2002, Plaintiff saw Dr. Hamdan–Anan for a medication review. Tr. at 380–81.

On January 3, 2003, Dr. Hamdan–Anan noted that Plaintiff's progress "has been up and down because of a lack of compliance with taking the medications. The mother blames the school, and the school blames the mother." Tr. at 382.

On July 8, 2003, Plaintiff underwent a psychological evaluation by Douglas McCollum, Ph.D. Tr. at 376–77. On the Wechsler Intelligence Scale for Children—III, Plaintiff scored a Verbal I.Q. of 71, a Performance I.Q. of 75, and a full scale I.Q. of 71. Tr. at 376. Dr. McCollum noted that testing showed that Plaintiff continued to be in need of special education services and that she was in need of intensive behavior management assistance. The diagnostic impression was borderline intellectual functioning, oppositional defiant disorder, and ADHD, combined type. Tr. at 377.

On August 4, 2003, Dr. Hamdan–Allen noted that Plaintiff's ADHD symptoms were "fairly well controlled." The doctor discontinued the medication Remeron and prescribed Risperdal. Tr. at 379.

On September 20, 2004, Plaintiff saw Dr. Hamdan–Allen. Plaintiff was taking Adderall and Clonidine and the doctor noted that Plaintiff was not getting her medication at noon. The doctor continued Plaintiff's medication and wanted to make sure that she got the noon dose. The doctor said she had ordered an EEG.

On October 26, 2004, Plaintiff saw Dr. Hamdan–Allen. Plaintiff was taking Adderall and Clonidine. The doctor noted that Plaintiff was doing well in school,

---

**1.** The essential feature of phonological disorder is a failure to use developmentally expected speech sounds that are appropriate for the individual's age and dialect. DSM–IV–TR, at page 65.

because of the small classroom size, and that Plaintiff had improved academically and behaviorally. Plaintiff had not undergone the EEG test. Tr. at 373.

On January 18, 2005, Plaintiff was seen by Richard Quarton, Ph.D., at Vera French Community Mental Health Center. It was noted that Plaintiff had not taken her medication that morning because she didn't have any. The psychologist wrote: "Mother seems ambivalent regarding the use of medications. From time to time she evidently does not give them as prescribed." Plaintiff's mother stated that she would like her daughter to do better without the use of medication. Tr. at 374.

On September 3 and 14, 2009, Plaintiff was seen at Vera French Community Mental Health Center for testing of cognitive and achievement levels. Tr. at 308–11. Tests administered were the Wechsler Adult Intelligence Scale—Fourth Edition (WAIS–IV), the Wide Range Achievement Test—Fourth Edition (WRAT–IV), and Clinical interview and observations and case file review. On the WAIS–IV, Plaintiff scored a full scale IQ of 72, a Verbal Comprehension of 68, and Perceptual Reasoning of 79. It was noted that the eleven point difference between Verbal Comprehension and Perceptual Reasoning indicated "challenges related to learning and processing verbal and written-based information." Tr. at 308. Results on the WRAT–IV showed abilities well below her peers. On Axis I, diagnoses were ADHD, ODD (per history), and learning disability. On Axis II the diagnosis was mild mental retardation. Tr. at 309.

On February 7, 2011, Plaintiff saw Dr. Hamdan–Allen for a medication check. The doctor noted that as a result of Plaintiff taking her medication at school, her behavior was more tolerable. However, it was noted that Plaintiff was argumentative, and that she was demanding to move from her mother's home upon graduation from high school. The doctor advised Plaintiff's mother to discuss future plans for Plaintiff with a Department of Human Services case manager. The doctor continued Plaintiff's medications which were Adderall and Abilify. Tr. at 319.

On February 10, 2011, Plaintiff was seen by Suzanne Ward, Ph.D. for a psychological evaluation at the request of Disability Determination Services. Tr. at 312–15. It was noted that Plaintiff was about to graduate from high school, but was uninterested in attending a program at the local community college that assists students who have been involved in special education. Plaintiff's mother reported that Plaintiff had significant problems with behavior including dating much older men and shoplifting. On mental status examination, it was noted that Plaintiff was argumentative, often speaking over her mother. Nevertheless, Plaintiff appeared to have a poor fund of knowledge and limited interest in conversation. Tr. at 313. On the WAIS–IV, Plaintiff scored a full scale IQ of 70, Verbal Comprehension score of 80, and Perceptual Reasoning of 71. Tr. at 313–14. On Axis I, diagnoses were: oppositional defiant disorder, and attention deficit/hyperactivity disorder—combined type. On Axis II, diagnoses were: borderline intellectual functioning; and, antisocial and borderline traits. Tr. at 314. Dr. Ward wrote:

Her testing confirms that her cognitive problems are of an organic nature not due to malingering or lack of motivation. She has impaired adaptive functioning due to her cognitive impairment. She has poor executive functioning skills, as well as a limited judgment and insight into her action. Ms. Bailey has problems with her adaptive functioning, which significantly interfere with her ability to navigate through many every-

day situations without assistance, and she isn't likely to be successful handling her own finances and cash benefits without training. Ms. Bailey will require additional supports in the community which at this time she is unwilling to pursue to develop independence.

Tr. at 315.

Plaintiff saw Dr. Hamdan–Allen on May 6, 2011. Although Plaintiff had been taking Adderall and Abilify, she was not taking medication at the time of the examination. The doctor wrote that Plaintiff's mother was attempting to obtain a guardianship, and that Plaintiff:

> ...states that she has been taught in school that once she becomes an adult her mother cannot be her payee and she can move out and refuse taking the medication.... The mother worries about her because she shows very poor impulse control. For example, Drewcilla went to Chicago with a man who abandoned her. She called her mother, who sent her a bus ticket so that she could come home. Drewcilla refuses to share with me the nature of that event stating, "I don't have to share my business with you." ...

Plaintiff told the doctor that she had been accepted at Ashford University in Clintion, Iowa. The doctor wrote that Plaintiff would not be given prescriptions. "She is told that her file will be open for a year and a half if she needs to come back. Otherwise, she will have to come in as a new patient." Tr. at 320.

Plaintiff was seen ten times between November 3, 2010, and November 16, 2011, at the Waterford Family Medicine clinic. Tr. at 323–48.

On December 9, 2011, Plaintiff was seen at Vera French by Michelle Schnack, ARNP. Tr. at 352–57. On arrival, Plaintiff said she wanted to get her benefit check back and that she needed to restart her medication. Tr. at 352. Nurse Schnack noted that Plaintiff had been treated for ODD and ADHD at Vera French and other clinics "on and off" since she was three years old. Plaintiff's borderline intellectual functioning was also noted. Between ages 16 and 17, Plaintiff had been placed at a residential treatment facility because of behavior problems. It was noted that over the years Plaintiff had been prescribed several medications, but that neither Plaintiff nor her mother could provide information about which were effective. Tr. at 354. The treatment note states: "... her chart reveals improvement with Abilify and Adderall." Plaintiff's goals were listed as "1) less arguing, and 2) get own place." Nurse Schnack noted that it would be important for Plaintiff to participate in individual therapy, to have case management service and to comply with medication management. Tr. at 356.

Plaintiff saw Nurse Schnack on January 6, 2012. Tr. at 358–60. Plaintiff reported that her medication had been helpful in that she was not getting into so many arguments. "She talks about her goals of managing her anger better, regaining her disability benefits, developing money management skills, and eventually moving into a place of her own." It was noted that Plaintiff had been seeing Bob Nagle LMHC for individual therapy. Under the heading "medication response," Nurse Schnack noted moderate improvement. Tr. at 358.

On February 23, 2012, Plaintiff underwent a psychological evaluation by Robert Nagle, MA, LMHC, MSW, and by Rhonda Callison, Psy.D. & L.P. The WAIS–IV was administered and showed that Plaintiff functions within a borderline to mild mental retardation range. Tr. at 365–66.

A form entitled Medical Opinion Re: Ability to do Work–Related Activities

(Mental) was completed by Nurse Schnack and Mr. Nagle. The form was signed by Nurse Schnack on July 13, 2012, and countersigned on August 10, 2012. The "check box" form asked for an opinion on how an individual is limited in several domains. Two domains were checked "limited but satisfactory." Eighteen of the domains were checked "seriously limited, but not precluded." Five domains were checked "unable to meet competitive standards." Tr. at 367–68.

On August 12, 2012, Mr. Nagle wrote a narrative report explaining how the diagnosis of mild mental retardation was arrived at using the test results from the WAIS–IV, and the criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR). The diagnosis was also supported by information supplied by Plaintiff's mother about her functioning at home and at school. Tr. at 370–71.

### HEARING TESTIMONY

At the hearing on May 3, 2013, in his opening statement, counsel stated that it was his contention that Plaintiff meets the requirements of section 12.05 C of the listings of impairments. Tr. at 30.

Plaintiff testified that she had gone to Ashford University from August to October, 2012. When asked why she was no longer in school, Plaintiff responded, "Tuition and the homework got hard on me. So I barely could focus or do it." Tr. at 34. She said she had lived in a dorm, but that she could not get along with the other students. Tr. at 34–35.

Plaintiff said she was not taking any medication at the time of the hearing. Tr. at 38. The ALJ asked Plaintiff why she was not taking medication and she responded that it was because of the stress of dealing with the death of her cousin. Tr. at 39.

On July 12, 2013, the ALJ scheduled a supplemental hearing. Tr. at 52–84. The ALJ called psychiatrist Nathan Strahl, M.D. (Tr. at 169–72) to testify as a medical advisor. Tr. at 55. Plaintiff's counsel was asked if there were objections to Dr. Strahl testifying as a medical expert, and he responded that he did not object. The expert was asked to identify Plaintiff's medically determinable impairments. Tr. at 57. The expert identified: Attention deficit hyperactivity disorder, oppositional defiant disorder, mild mental retardation, and antisocial and borderline traits. The medical expert testified that he was familiar with the medical listings, including section 12.05 C. Tr. at 58.

The medical expert was asked if he had an opinion about whether Plaintiff's medical impairments individually or in combination, meet or medically equal any of those in the listings. The expert responded that he would express two opinions which the ALJ would need to resolve. Tr. at 59. The doctor testified that Plaintiff's IQ scores supported a diagnosis of mild mental retardation with deficits in adaptive functioning. The doctor testified that his two opinions had to do with the need to establish an additional severe physical or mental impairment. The doctor identified attention deficit hyperactivity disorder. Tr. at 61.

The medical expert testified that the medical records establish that when Plaintiff takes her medication as it's prescribed, neither Attention Deficit Hyper Activity disorder, nor Oppositional Defiant Disorder satisfy the requirements of the listing. Tr. at 62.

The ALJ asked the medical expert if there was anything in the record—such as adverse side effects—which would make compliance with the prescribed treatment problematic. The medical expert respond-

ed that the treatment notes establish that while Plaintiff might not like taking medications, they were helpful. The medical expert said that part of the problem is Plaintiff's "sense of rebelliousness—part of her ADHD, part of her ODD." Tr. at 64. "However, she—it's clear in the medical record that she appreciates that compliance has been a helpful thing for her." The doctor pointed out that when Plaintiff came back for treatment in December 2011, her reasoning was that seeking medication would validate her case for disability. Tr. at 65.

The ALJ asked the medical advisor to set out Plaintiff's functional restrictions. Tr. at 66. The medical expert testified that Plaintiff should be limited to simple, routine, repetitive tasks. "She may not want to; but I believe she'd be capable of doing that." Tr. at 67.

On cross examination, the medical expert was asked about Dr. Ward's statement that Plaintiff's difficulties are of an organic nature not due to malingering or lack of motivation. The doctor responded that he was aware of that notation, but that he could find no support in the medical records for an organic impairment. Tr. at 68. The doctor went on to note the numerous mentions in medical records of Plaintiff's poor motivational drive, and her unwillingness to follow general rules, but that he could find no evidence consistent with a head injury or brain damage at birth, or anything else to support an organic impairment. Tr. at 68–69.

Counsel asked the medical advisor if Plaintiff was taking her medication exactly as prescribed, would her ADHD and ODD leave her with less than slight or minimal limitations. Tr. at 72. The medical expert responded:

I would expect it to be more than minimal limitations. I'm looking at the concept here of IQ that is in the competitive range but on a simple, routine, repetitive task basis. Nothing detailed, nothing complex. And you add in, even with treatment, some [inaudible] behavioral issues, then you would have, certainly, more than mild.... But not marked or not extreme would be my point.

Tr. at 73.

## ALJ's DECISION

In his decision, the ALJ considered all of the medical and other evidence presented in the case, including the opinions expressed by Nurse Schnack and Mr. Nagle. Tr. at 17. The ALJ also carefully considered the testimony of the medical expert. Tr. at 17–18. As a part of his rationale for finding Plaintiff does not meet or equal a listed impairment, the ALJ wrote:

After carefully considering the evidence and the regulations, the undersigned is not satisfied that the claimant has satisfied her burden of demonstrating that she is disabled. While her mild mental retardation is a significant impairment, the record does not demonstrate clearly that she has the significantly limited functional capacity and lack of adaptive functioning that are associated with a severe and disabling mental impairment. The undersigned is not convinced that her ADHD and/or antisocial personality traits constitute another mental impairment that imposes an "additional and significant work-related limitation of function." Both of these impairments have responded to treatment, and she has not satisfied her burden of identifying an acceptable reason for failure to follow treatment. The record supports no more than mild limitations in daily activities, moderate limitations in social functioning and concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. She does have limi-

tations and restrictions, but the vocational expert found jobs even when considering these. Given these finding, the undersigned cannot conclude that the claimant is entirely disabled under the guidelines of Social Security Ruling 96–7p and 20 C.F.R. 416.929.

Tr. at 18. The ALJ also wrote that Plaintiff had not met her burden of demonstrating that she cannot or should not be expected to comply with treatment. *Id.* The ALJ wrote that he considered and gave some, but not great or controlling, weight to the opinions of Nurse Schnack and Mr. Nagle. The ALJ noted the short treating relationship between Nurse Schnack and Plaintiff and the lack of treating relationship between Mr. Nagle and Plaintiff. Although Mr. Nagle evaluated and tested Plaintiff, the ALJ noted that Mr. Nagle rendered his opinion five and a half months after the testing. Tr. at 19.

## DISCUSSION

■■■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue,* 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart,* 372 F.3d 946, 950 (8th Cir.2004).

■■■ We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue,* 528 F.3d 1113, 1115 (8th Cir.2008)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.*

(quoting *Nicola v. Astrue,* 480 F.3d 885, 886 (8th Cir.2007)). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue,* 551 F.3d 792, 798 (8th Cir.2008.) In *Brand v. Secretary of Dept. of Health, Education and Welfare,* 623 F.2d 523, 527 (8th Cir.1980), Chief Judge Lay wrote that *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In *Universal Camera,* the Court wrote:

We conclude, therefore, that the Administrative Procedure Act and the Taft–Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

*Id.,* 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

In *Jackson v. Bowen,* 873 F.2d 1111, 1113 (8th Cir.1989), the Court described its duty as follows:

> The district court delineated its standard of review by stating that the Secretary's decision is conclusive if supported by substantial evidence. Such a broad-based search of the record for evidence supporting the Secretary's findings is inappropriate when reviewing an administrative decision. *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (citations omitted). Rather the district court's review should be based on whether substantial evidence on the record as a whole supports the Secretary's decision. A notable difference exists between "substantial evidence" and "substantial evidence on the record as a whole":
>
> > "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (citations omitted).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

In outline form, Plaintiff's arguments are:

I. JUDGE SCHWARTZ'S FINDING THAT MS. BAILEY DOES NOT MEET OR EQUAL LISTING 12.05(C) IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

A. Judge Schwartz's finding on listing 12.05(C) is contradicted by the testimony of a medical expert to whom he assigned great weight.

1. Judge Schwartz's finding that Ms. Bailey has no severe impairments in addition to her mild mental retardation is contradicted by Dr. Strahl's testimony, and is not supported by substantial evidence

2. Judge Schwartz's finding that there is no valid basis for Ms. Bailey's non-compliance is contradicted by Dr. Strahl's testimony and is not supported by substantial evidence

B. Judge Schwartz himself found impairments in social interaction that satisfy the listing requirement of an additional, severe impairment.

C. Judge Schwartz erred in failing to develop the record of the reasons for Ms. Bailey's non-compliance

II. THE TESTIMONY OF THE VOCATIONAL EXPERT IS NOT SUBSTANTIAL EVIDENCE TO SUPPORT JUDGE SCHWARTZ'S FINDING THAT OTHER WORK EXISTS THAT MS. BAILEY CAN DO

The Court has considered each of these arguments, the most persuasive of which is

that the ALJ did not follow the Commissioner's guidelines regarding the issue of failure to follow prescribed medical treatment.

Plaintiff argues that she meets a listed impairment, namely section 12.05 C. In order to meet that section of the listings a claimant must have a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing an additional and significant work-related limitation of function. This listing also requires the showing of deficits in adaptive functioning initially manifested during the developmental period, i.e. before the age of 22. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir.2006).

The medical advisor provided expert testimony that Plaintiff meets the IQ requirements of the listing. He also testified that Plaintiff's has shown deficits in adaptive functioning. Problems with adaptive functioning were also noted by Dr. Ward. The fighting issue is whether or not Plaintiff has an another impairment which imposes an additional and significant work-related limitation of function. The medical advisor testified that "the other disorder that she really has that fits that is the attention deficit hyperactivity disorder." *See*, Tr. at 61. The ALJ, however, determined that ADHD was not a severe impairment because of Plaintiff's noncompliance with prescribed medical treatment, namely medication which had been shown to ameliorate the effects of the impairment.

In her brief, Plaintiff points to Social Security Ruling (SSR) 82–59 to support the argument that the ALJ failed to comply with the mandatory procedures to make a finding of failure to follow prescribed treatment. "Once published, Social Security Rulings are 'binding on all components of the Social Security Administration.' 20 C.F.R. § [402.35 (2014)]" *Grebenick v. Chater*, 121 F.3d 1193, 1200

(8th Cir.1997). *See also Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir. 1990)(". . . an agency's failure to follow its own binding regulations is a reversible abuse of discretion." citing *City of Sioux City v. Western Area Power Admin.*, 793 F.2d 181, 182 (8th Cir.1986).

The aforementioned SSR and 20 C.F.R. § 416.930(c) list examples of acceptable reasons for failure to follow prescribed treatment. These examples include religious reasons, fear of surgery, and others. The regulation also states: "We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment." *Id.* In *Pate–Firees v. Astrue*, 564 F.3d 935 (8th Cir.2009), the Court discussed SSR 82–59. Regarding the circumstances which are considered to justify failure to comply with prescribed treatment, Court wrote:

> Although none of the listed circumstances pertain to mental illness, federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the "result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D.Pa. 1996) (citing *Sharp v. Bowen*, 705 F.Supp. 1111, 1124 (W.D.Pa 1989)); *see also Frankhauser v. Barnhart*, 403 F.Supp.2d 261, 277–78 (W.D.N.Y.2005)(holding an ALJ must take into account whether a mentally ill (bipolar and personality disordered) claimant's failure to comply with prescribed treatment results from the mental illness itself); *Brashears v. Apfel*, 73 F.Supp.2d 648, 650–52 (W.D.La.1999)(remanding case for consideration of whether the claimant's non-compliance

with prescribed treatment was excusable due to a mental impairment).

*Id,* at 945.

In *Grubb v. Apfel,* 2003 WL 23009266 (S.D.N.Y.), the Court wrote that the regulations emphasize that the "ALJ must provide claimant with (i) notice of the effect of noncompliance on his or her application for benefits, (ii) occasion to explain any seeming noncompliance, and (iii) opportunity to undergo the prescribed treatment." The Court noted that SSR 82–59 "mandates" that the individual must be informed of the effect of compliance on the application for benefits. The Court wrote:

> As a procedural matter, if the commissioner fails to provide the claimant with an opportunity to address the issue, he loses the ability to assert it as a reason for denying disability benefits. SSR 82–59 directs that "[i]f the issue of 'failure' arises at the hearing or [Appeals Council] levels, if not fully developed through testimony and/or evidence submitted, and it has been 12 months after the onset, a favorable decision will be issued, and the case will be referred for development of failure to follow prescribed treatment."

 In the case at bar, the ALJ mailed a Notice of Supplemental Hearing. Tr. at 175–80. The notice contains a statement of issues to be considered at the hearing. Tr. at 177–78. The Notice states that the ALJ would decide if Plaintiff's has a physical or mental condition which keeps her from doing any substantial gainful work, and if the condition is expected to result in death, or if it has lasted, or can be expected to last, 12 continuous months. The ALJ explained that he would follow the sequential evaluation to decide the case. Tr. at 177. The notice states that a vocational expert and a medical expert would testify. Tr. at 178. No notice is provided that the ALJ would consider whether or not Plaintiff has complied with prescribed medical treatment as required by SSR 82–59.

As stated above, SSR 82–59 states that if the issue of compliance with medical treatment arises for the first time at the hearing level or at the Appeals Council level, "... and it has been 12 months after onset, a favorable decision will be issued, and the case will be referred for development of failure to follow prescribed treatment." Plaintiff's application for benefits was filed October 28, 2011. Her first hearing before the ALJ was May 3, 2013, more than 12 months after the alleged onset. At the first hearing, Plaintiff asserted that she qualified for benefits under the provisions of Section 12.05 C of the listings. But for the ALJ's finding at step two of the sequential evaluation that Plaintiff's only severe impairment is mild mental retardation because the failure to follow prescribed treatment of ADHD, a finding of disabled would have been appropriate at step 3.

 The ALJ committed error by failing to follow the guidelines set forth in SSR 82–59 which requires a favorable decision when the issue of non-compliance arises for the first time at the hearing level. Thus, a reversal with an order to award benefits is the appropriate remedy in this case. *See Maresh v. Barnhart,* 438 F.3d at 901 quoting *Jones v. Barnhart,* 335 F.3d 697, 699 (8th Cir.2003) ("If the claimant wins at the third step (a listed impairment), she must be held disabled, and the case is over.").

Because failure to follow prescribed treatment is an issue in this case, the Commissioner undoubtedly will immediately refer the case for further development in accordance with the requirements of SSR 82–59. It may very well be that Plaintiff's failure to follow prescribed med-

ical treatment is a reason to terminate her benefits, but she must be given notice of that inquiry, the opportunity to present her reasons for that failure to follow treatment if it exists, and the opportunity to comply with the treatment recommendations of her treating physician(s).

In the interim, Plaintiff is entitled to the benefits for which she applied. *See Pate–Fires v. Astrue,* 564 F.3d at 947 (the Court ordered benefits to be awarded because "... the clear weight of the evidence fully supports a determination Pate–Fires is disabled within the meaning of the Social Security Act and is entitled to benefits as of [the onset of disability date].")

### CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in *Gavin v. Heckler,* 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[2]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996

(2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

2. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."